Donna J. DEMAREE, Plaintiff,

v.

TOYOTA MOTOR CORPORATION, Defendant.

No. 3:97CV–6–M.

United States District Court, W.D. Kentucky.

Feb. 9, 1999.

**960**

F. Thomas Conway, Chad Gardner, Louisville, KY, for Donna J. Demaree, plaintiff.

Alan Thomas, Huie, Fernambuco & Stewart, Birmingham, AL, William D. Grubbs, Woodward, Hobson & Fulton, Louisville, KY, for Toyota Motor Corporation, defendant.

Terri S. Walters, Riley & Walters, Pikeville, KY, for Commonwealth of Kentucky, Department of Personnel, intervening, plaintiff.

## MEMORANDUM OPINION AND ORDER

MOYER, United States Magistrate Judge.

This automotive products liability case presents significant issues arising under the Supreme Court's *Daubert* decision. Because the court concludes that the opinion of plaintiff's principal expert, James Kita, is based wholly on speculation, and not on any adequate scientific basis, the court struck the opinion at the close of plaintiff's case and then directed the entry of a judgment as a matter of law under Fed.R.Civ.P. 50.[1] This memorandum opin-

ion will set out in greater detail the basis for this ruling.

### Background of the Lawsuit

Plaintiff, Donna Demaree, was driving her Toyota Paseo west on Grinstead Drive on August 8, 1996 in a driving rain. According to the plaintiff, she was wearing a seat belt and driving at a reduced speed because of the rain, when her Toyota "hydroplaned" and went across the center line of the road, striking an oncoming Jeep Cherokee. There was dispute at the trial as to the speed of the Toyota at the time of the collision. Plaintiff asserted that she was going no more than 15 mph; however, on cross-examination, the proof from the contemporaneous traffic and hospital records tended to show a speed of 25 mph for the Toyota. The exact speed would, of course, be a question for the jury, but a resolution of the issue is not necessary because, even under plaintiff's version of the facts, her products case is inadequate as a matter of law.

Plaintiff sustained significant injuries to her wrists and arms from the deployment of the air bag in the collision. It was undisputed that air bags deploy with considerable velocity, and that the sudden inflation of the air bag in this case was the cause of the orthopedic injuries plaintiff experienced. She had one initial surgery after being evacuated from the accident scene, and subsequently had another surgery which required the installation of an external fixation device to her left upper arm while the bones healed. Plaintiff has returned to work and has received a promotion since the accident, but the proof at trial showed that she suffered some permanent disability to her left arm, which no longer extends as it did before. Plaintiff also lost work time, experienced pain and suffering from the accident, and had the difficult experience of having to recuperate from the surgery in a nursing home, even though a relatively young person, because

---

1. Plaintiff had no objection to the entry of judgment as a matter of law on the claims of breach of warranty, manufacturing defect, and misrepresentation. These claims were contained in the complaint but were not pursued at trial.

her multiple wrist and arm injuries made her temporarily unable to care for herself. Toyota at no time disputed that the injuries were caused by the air bag deployment. Instead, the focus of the case has been on whether there is a design defect associated with the air bag.

The lawsuit was originally filed in Jefferson Circuit Court and was removed to federal court. The parties consented to trial before the magistrate judge. A jury was empaneled and the trial was held from January 20, 1999 to January 26, 1999. On January 26, 1999, the court granted defendant Toyota's motion under Rule 50 for judgment as a matter of law.

### Applicable Law

Rule 50, Federal Rules of Civil Procedure, states, in part:

**(a) Judgment as a Matter of Law**

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against the party and may grant a motion for judgment as a matter of law against that party with respect to a claim ... that cannot under the controlling law be maintained ... without a favorable finding on that issue.

■■■■ When considering a motion for judgment as a matter of law based on insufficiency of the evidence, the court should not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury; rather, it must view the evidence in a light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences. *K & T Enters. v. Zurich Ins. Co.,* 97 F.3d 171, 175–76 (6th Cir.1996); *Aparicio v. Norfolk & Western RR Co.,* 84 F.3d 803, 806–07 (6th Cir.1996); *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 56 F.3d 726, 734 (6th Cir.1995). The motion should be granted "whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that rea-

sonable minds would not differ." *Tuck v. HCA Health Servs., Inc.,* 7 F.3d 465, 469 (6th Cir.1993); *accord, Aparicio,* 84 F.3d at 806–07; *Powers v. Bayliner Marine Corp.,* 83 F.3d 789, 796 (6th Cir.1996).

■■■■ Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the trial court has a gatekeeper function which requires an assessment of the admissibility of expert testimony. The court is to determine:

whether the expert's testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science.'

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) (on remand), *quoting, Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). An expert opinion that is based on scientifically valid principles will satisfy Fed. R.Evid. 702; an expert's subjective belief or unsupported speculation will not. *Smelser v. Norfolk Southern RR Co.,* 105 F.3d 299, 303 (6th Cir.1997). When considering reliability, the trial court must focus on the soundness of the expert's methodology and not the correctness of his conclusions. *Id.* The Supreme Court provided a non-exclusive list of factors to be considered by the trial court:

(1) whether a theory or technique can be (and has been) tested,

(2) whether the theory or technique has been subjected to peer review and publication,

(3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation, and

(4) whether the theory or technique has been generally accepted in the particular field.

*Id., quoting, Glaser v. Thompson Medical Co., Inc.,* 32 F.3d 969, 972 (6th Cir.1994)

(citations omitted). The Ninth Circuit added another factor for the court to consider in assessing the reliability of the expert opinion:

'whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying' because the former 'provides important, objective proof that the research comports with the dictates of good science.'

*Smelser*, 105 F.3d at 303, *quoting*, *Daubert* (on remand), 43 F.3d at 1317.

### *Daubert* and the Kita Opinions

■ This case was marked by numerous disputes over the admissibility of expert opinion testimony proffered by plaintiff. Prior to trial, the court granted Toyota's motion *in limine* to bar that part of the testimony of a medical doctor who proposed to offer opinions on air bag design and related automotive design issues. The court held a *Daubert* hearing prior to trial on Dr. Smock's automotive opinions, and granted the motion *in limine* with respect to his proffered automotive engineering opinions in a written ruling. The medical doctor, Dr. Smock, was permitted to testify on medical issues at trial and made a detailed presentation. Toyota chose not to cross-examine Dr. Smock on his medical opinions.

Plaintiff's counsel at one point quipped in a pretrial conference that Toyota never met a plaintiff's expert whom it liked and who met the *Daubert* standard. After granting, in part, the *in limine* motion as to Dr. Smock, the court approached with some skepticism Toyota's attack on Mr. Kita, plaintiff's engineering expert. Mr. Kita was permitted to testify at trial, and was subject to lengthy and detailed cross-examination concerning his air bag design opinions. Kita's opinion, to some extent, purported to rely upon, or at least to refer to documents discussed by a Toyota engineer in a deposition. Toyota waited until the close of the plaintiff's evidence, and

after the testimony of Toyota engineer Katshuiko Emori had been heard by videotape deposition, to move to strike Kita's testimony.

Kita's principal opinion, to which Toyota vigorously objected, related to the air bag deployment threshold for the Toyota Paseo. It is undisputed that air bags deploy in a collision with great force, and the force of deployment can cause injury to the driver. Automobile manufacturers do not want the air bags to explode out in a very low speed parking lot bump, but certainly do want the airbags to deploy, and rapidly, in a high speed crash. The issue in this case is how and where the manufacturer should set the threshold speed at which the airbag should activate—should it be 10 mph, 15 mph, 20 mph, 30 mph? If the manufacturer sets the threshold unreasonably low, passengers may suffer fractures or lacerations from the deployment of the airbag at a speed at which its protection is not needed. If the threshold is set too high, then the airbag will fail to deploy in certain collisions where the driver could benefit from airbag protection.

The design of the airbag threshold is further complicated by the fact that the National Highway Traffic Safety Administration has set certain protection parameters for the airbag when deployed in a 30 mph crash, and by the fact well-known to automobile manufacturers that some drivers choose not to wear seat belts while other drivers do wear them. Thus, some drivers in a collision will have the protection of the seat belt. Unbelted drivers, however, will lack seat belt protection and their only protection from injury will be the airbag. The Toyota airbag system in the Paseo was called an SRS—supplemental restraint system—indicating that it is supplemental to the seat belt system. Toyota designed the Paseo airbag to deploy in a range of 8–12 mph. Thus, below eight mph, the bag should never deploy. Above 12 mph, it should always deploy. In between, it may deploy. The collision for which this deployment threshold is set

is a direct frontal collision with a fixed barrier—i.e., running head-on into a brick wall.

Mr. Kita attacked in his testimony the Toyota deployment threshold. In his opinion, it was set far too low, and instead should be set at 20–25 mph. This opinion would be highly significant to this trial, because according to the testimony of Ms. Demaree, she was going 15 mph when she collided on Grinstead Drive with a Jeep Cherokee headed in the other direction. Following the analysis of plaintiff's expert, the airbag should not have deployed at all in this collision. The numbers are very important: if Ms. Demaree was indeed going 15 mph,[2] then her speed was in the range where the airbag would always deploy. It is undisputed that the airbag did deploy in the crash, and that Ms. Demaree sustained significant orthopedic injury to her hands, wrists, and arms. Moreover, Dr. Smock testified that, given the speed of the collision and the fact that plaintiff was wearing her seat belt, Ms. Demaree would have walked away uninjured had the air bag not deployed.[3]

Under Kita's theory, with a deployment threshold of 20–25 mph, Ms. Demaree's airbag certainly would not have deployed in the collision in question. Thus, according to plaintiff's view, the air bag was defectively designed and that defective design caused the airbag to deploy unnecessarily, proximately causing the injury to Ms. Demaree of which she complains in this lawsuit. Apparently, Kita had not expressed an opinion about the Toyota deployment threshold prior to this case; i.e., the opinion was reached for the first time in the context of this case.

Toyota attacked the Kita deployment threshold theory in a motion *in limine,* and then in a motion to strike at trial. The court deferred ruling pretrial on the Kita opinion, being of the view that a full record of Kita's opinion and the basis for it was necessary for a careful ruling.[4] Having heard Mr. Kita, his cross-examination, and having carefully reviewed the documentary bases upon which Kita relies for his threshold opinion, the court is of the view that Mr. Kita's airbag threshold opinion presents a near-classic example of the kind of completely unsupported opinion in a scientific field of the kind which *Daubert* condemns.

The court will review in a moment the proffered basis for the Kita opinions. However, it is initially important to note what Kita's opinion does *not* rely upon:

Kita admitted that no other engineer in the world shares his opinion that the airbag should deploy at 20–25 mph in a frontal, fixed barrier collision.

Kita admitted that there is no literature, published or unpublished, which advocates a threshold deployment of 20–25 mph.

No court has ever ruled, nor has any verdict been rendered by a jury, that a design was defective because the airbag threshold was at a level which Kita proposes.

Kita himself has not published any paper on this theory, nor has he lectured on or given presentations to scientific or engineering or safety groups on this theory. Nor has he ever published any engineering paper at all on automotive safety matters or airbag design.

---

2. Toyota disputed this figure in cross-examination of Ms. Demaree and suggested that the hospital records indicated that she made statements at the time of the accident that she was going 25 mph..

3. There also was dispute in the proof about whether Ms. Demaree was wearing her seat belt or not. It is unnecessary to the court's ruling to determine whether her speed was 15 or whether it was higher, as Toyota would

contend; neither is it necessary to determine if she was wearing a seat belt. The court will accept, for analytical purposes, plaintiff's version of the facts, i.e., that she was wearing a seat belt and was going only 15 mph..

4. By contrast, the Smock design opinion could be ruled upon pretrial, in part because Dr. Smock is a medical doctor with no training or expertise in automotive design or engineering.

Kita himself has not performed any crash or sled tests which would support a threshold at 20–25 mph, nor did he identify any tests performed by anyone else which would support such a threshold.

Kita has not performed any computer modeling, finite element analysis, or other "virtual" testing of the effect of airbag deployment at the threshold he advocates.

Kita did not perform any mathematical calculations or other kind of quantitative analysis which supports his theory.

Kita did not identify any specific test data or results by NHTSA or by any automobile manufacturer which would support a deployment threshold in the range of 20–25 mph. In short, he did not rely on any threshold deployment study data of any kind, whether generated by his own tests, by models or simulations, or by other studies.[5]

Kita did not review or analyze any of the test data upon which Toyota itself may have relied to set the deployment threshold at 8–12 mph. Kita might have reviewed Toyota's own internal data which formed the basis for Toyota's deployment decision, and criticized that data as inadequate. Or Kita might have suggested that Toyota's data were misinterpreted, and suggested a different result. No such analysis was presented.

Thus, Kita's opinion lacks any of the usual indicia of reliability, the very kinds of indicia which Daubert teaches should be present in a scientific opinion. He presented a novel, untested, uncorroborated theory, which has not been subjected to debate, peer review, or publication, and which does not base itself on specific tests or data or calculations or quantitative analysis. While Mr. Kita declared himself at trial to be a "beacon in the night," cross-examination suggested that he was rather a "voice in the wilderness." Even if his opinion is unique to him, it must at least have an adequate basis to pass the Daubert threshold.

Having reviewed the scientific foundations upon which opinions might be based—but were not in this instance—the next stage of the analysis is to review what the bases were for Kita's conclusions. Kita's opinion was essentially based on two general areas. First, as argued by plaintiff's counsel in a lengthy hearing on the motion to strike, Kita pointed to a handful of Toyota internal documents to contend that Toyota was "all over the place" and was inconsistent in its own determination of deployment threshold. Second, Kita pointed to a particular set of data related to the effectiveness of the Toyota Paseo airbag at 30 mph, the so-called Calspan document. This opinion will discuss each in turn.

*The Toyota Internal Documents.* The first basis upon which Kita relied was a set of Toyota documents which purportedly show that Toyota has not always used the 8–12 mph range as the threshold deployment range. From these documents—which do not upon close review provide the kind of support which Kita suggests—Kita infers that the 8–12 range is not the "right" range; if Toyota has used other ranges, the analysis goes, then its setting of the 8–12 mph range is arbitrary or at least subject to question. However—and this is a critical point—none of the Toyota documents to which Kita points provides even a hint or a suggestion that the range should be at 20–25 mph. Thus, even if the documents might suggest that 8–12 mph is not the only range which Toyota might have chosen, none of them supports setting the deployment range as high as Kita actually opined: 20–25 mph. This range itself is important because Kita's opinion set the deployment range at a speed, 20–25 mph, which was well above plaintiff's estimated collision speed of 15 mph. If Kita had merely criticized the 8–12 mph range, but had not set a range which was comfortably

---

**5.** Kita did refer to the results of one report, the Calspan report, but, as analyzed below, that report was completely unrelated to deployment thresholds.

above Demaree's purported collision speed, there would have been a significant causation issue in the case.

Moreover, the documents do not provide the support which Kita ascribes to them. This opinion will review them one at a time.

A. *Exhibit 17—1977 Claybrook letter.* This is a letter from 1977, some fifteen years before the manufacture of plaintiff's Paseo, and before Toyota sold any car in the United States with airbags. It mentions that airbags would need field testing to determine whether they were non-operating in "low speed collisions" which were "less than the equivalent of a 15 mph frontal barrier crash." Nothing in this letter suggests at all that Toyota ever used 15 mph as an actual design parameter.

B. *Exhibit 43—1977 document.* While undated, this document was represented as likewise being from the 1977 time period, prior to the actual development of any airbags in consumer vehicles. It does mention that Toyota, at that time, was considering collision sensors in the 12–18 mph range. While this document is of interest, it certainly does not provide any basis for concluding that Toyota ever selected a deployment range of 12–18 mph, or how the range 12–18 mph was generated, or whether it was supported by testing or not. It is a best a hypothetical range, mentioned in the mid–1970's.

C. *Exhibit 18—Lexus airbag document.* This document is more contemporary, and apparently is from a Lexus brochure or handbook. It mentions that the Lexus airbag "is designed to deploy . . . in response to a collision force greater than that created by a crash into a fixed, nondeforming barrier at approximately 12 to 16 miles per hour." While this document is much closer than any other internal Toyota document to showing that Toyota has perhaps used different threshold parameters in different vehicles, such a range hardly provides support for airbag deployment at the 20–25 mph range proposed by Kita. Nor is there any explanation in Kita's opinion as to the significance of 12–16; why

that figure might be used, what differences, if any, there any between a Paseo and a Lexus, and what inferences can be drawn about the proper range for a Paseo.

D. *Exhibit 11—interrogatory answers.* This document merely provides information concerning the background of the 8–12 mph range actually used by Toyota for the 1994 Paseo.

In short, Kita's review of the Toyota documents was not a scientific analysis but a kind of pseudo-cross-examination, in which plaintiff used her engineering expert to attempt to poke holes in Toyota's 8–12 m.p.h. threshold. However, pointing out arguable inconsistencies is not independent scientific work and none of these documents can in any way be seen as providing a scientific or even a logical basis for a 20–25 m.p.h. threshold.

*The Calspan Documents.* The final asserted basis for the 20–25 mph threshold is a series of test results which were offered into evidence as plaintiff's exhibit 19. This document is a fairly lengthy compilation which sets out the results of airbag testing at 30 mph in a 1993 Paseo, to determine if the Paseo meets the requirements of driver protection set out in FMVSS 208. The argument made by plaintiff's counsel was to the effect that these test results are "so good" in terms of the airbag's protective nature, that there was "breathing room" for Toyota to move up the deployment threshold from 8–12 to 20–25 m.p.h.

This assertion is a classic *non sequitur.* What exhibit 19 shows is that the Toyota Paseo airbag, in a 30 mph crash, comfortably exceeds the federal crash protection standards. However, this document provides no analysis at all of the effects on a crash test dummy or a driver of crashes where the airbag *does not deploy.* The fact that the airbag does a very good job at 30 mph tells nothing at all about whether a driver needs the protection of an airbag at 12, 14, 16, 18, 20, 22, or 24 mph. The fact that an airbag is effective at 30 mph does not show that a passenger at 18 mph has no need of an airbag. There is nothing in

the Calspan document to which plaintiff's counsel or Mr. Kita has pointed, or which the magistrate judge has found, which provides any information or analysis of the effect of a frontal collision on a driver where the airbag does *not* operate. There is no data of any kind in this document which analyzes crash results for drivers *without airbags* at varying speeds for a frontal collision. It cannot provide any basis at all for an airbag deployment threshold opinion because it studies a completely different phenomenon.

The analysis under *Daubert,* with this background, is rather straightforward, as Mr. Kita's opinion is wholly lacking in the indicia of reliability which *Daubert* would require. *Daubert* teaches that the trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–93, 113 S.Ct. 2786. Rule 702 assigns "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant.... " *Id.* at 597, 113 S.Ct. 2786. This is the oft-cited "gatekeeper" role for the trial court. In determining whether an opinion is "scientifically valid," the trial court looks to several points. "Scientific methodology today is based on generating hypotheses and testing them.... " *Id.* at 593, 113 S.Ct. 2786. Among the factors which a trial judge will consider are whether the opinions or assertions or hypotheses are "capable of empirical test;" "whether the theory or technique has been subjected to peer review and publication;" and whether there is "widespread acceptance" or "minimal support" for the theory. *Id.* at 593–94, 113 S.Ct. 2786. The opinion also makes it plain that these principles can be applied in the context of directing a judgment:

> ... [I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position is more likely than not is true, the court remains free to direct a judgment, Fed.Rule Civ.Proc. 50(a), and likewise to grant summary judgement, Fed.Rule Civ. Proc. 56.

*Id.* at 596, 113 S.Ct. 2786, *citing Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349 (6th Cir.1992) for the proposition that direction a judgment of acquittal is an appropriate procedure where the proffered opinion is patently inadequate.

Surely this is the only possible conclusion here. Not only is the 20–25 mph threshold opinion unique to Mr. Kita, unpublished, unverified, and untested, it is not supported by any analysis which the trial court can identify as scientific. His opinion is essentially speculative, and at best rests on the inadequate premise that because Toyota had occasionally mentioned some other numbers in its corporate records, he was free to recommend a higher threshold without any scientific basis for the higher numbers. Speculation is not science and *Daubert* mandates the rejection of such opinions.

Finally, the trial court believes that it is imperative to identify the very serious nature of the proposition which Kita asserts. Currently, passengers driving a Toyota Paseo (and, one infers, other Toyotas as well) have the protection of an airbag at collision speeds from 12 mph and up. Under the Kita hypothesis, passengers need not have the certainty of airbag protection until 25 mph is reached. As a result, were Kita's hypothesis to be implemented by Toyota, airbag protection would be *taken away* from passengers in collisions between 12 and 24 mph. What scientific basis, one must ask, would support the partial deactivation of a safety device which is mandated by federal law? Would greater injuries to the public result from such a deployment threshold, which would have the effect of removing all protection for an unbelted driver until the brick wall crash speed is 25 mph or greater? Would the trade-off of eliminating the unwanted consequence of hand and arm injuries such as those suffered by Ms. Demaree be outweighed by the head, neck, and brain injuries which passengers, belted and un-

belted, would sustain without airbag protection? One searches in vain for a basis in science for such a dramatic assertion. If a scientific foundation exists for a dramatic change in the airbag deployment threshold, it certainly was not presented in this case.

### Horn Design

■ Plaintiff's case had a complete failure of proof on the horn design issue. Plaintiff contended that it was a design defect to place the horn button in the middle of the steering wheel mechanism, on the airbag deployment module. The theory, apparently, was that one of the horn buttons was placed on the same part of steering wheel mechanism as contained the airbag module. Thus, plaintiff would contend, blowing the horn by pushing that particular button would put the driver at risk because the driver would place his or her hand right on top of the exploding airbag module. This design defect theory was completely unsupported by any expert testimony on design or on causation. No proof was offered by any person skilled or knowledgeable in automotive design that the horn button was poorly positioned or should be moved; neither was there any proof of any kind that having the horn button in a different place would have resulted in lesser or different injuries to the plaintiff.[6] The only testimony offered was that plaintiff herself, following the accident, chose to buy a vehicle, a Saab, which does not have any horn button on the airbag module in the center of the steering column. The plaintiff's own consumer choice, post-accident, certainly cannot provide the basis for a design defect theory.

---

**6.** See discussion below on causation issues related to plaintiff's warning theory.

**7.** Here, again, it is important to identify what plaintiff is not contending. Plaintiff did not challenge the airbag design, in the sense of disputing the force and speed with which it deploys. Plaintiff, in other words, did not argue for a "kinder and gentler" airbag which

### The Warnings Issue

Plaintiff's final theory is that Toyota had failed to warn adequately that there was a risk of serious injury associated with the deployment of airbags. This theory has at least three fatal flaws in it: first, there is no duty to warn of a danger that is known to the consumer; second, there was a complete failure of proof on the causation issue; and, third, plaintiff failed to produce proof of what a warning should or might have been.

The warnings issue, on first glance, might appear to have superficial merit. Air bags, it is undisputed, have pro's and con's. They provide protection in frontal collisions, and are mandated by the federal government. Yet is also undisputed that airbags can cause injury when they deploy, and Ms. Demaree sustained such an injury. Thus, they are mandatory safety devices which also present some unavoidable risks.[7] Thus, plaintiff would argue, since there is an undeniable risk associated with airbag deployment, the manufacturer should warn of the risk.

■ There is one simple and straightforward, initial reason why the warning theory fails. Kentucky law does not require there to be a warning if the user if aware of the product's danger. *Hutt v. Gibson Fiber Glass Products, Inc.*, 914 F.2d 790, 793 (6th Cir.1990) (applying Kentucky law); *Smith v. Louis Berkman Co.*, 894 F.Supp. 1084, 1092 (W.D.Ky.1995) (applying Kentucky law). In the present case, the plaintiff testified on cross-examination that prior to the accident she knew the airbag was located in the center of the steering wheel, that the airbag deployed with a great deal of force, and that people had been injured by the force of a deploying airbag. She testified that she had

would deploy less explosively. Moreover, this is not a case of a diminutive female or an infant who suffered injuries from airbag activation, the kind of injury the subject of much recent press coverage. Plaintiff by her own words is a "big girl" in terms of weight, and at 5 feet 5 inches is not an unusually short person, either.

heard of people having their "thumbs ripped off." Plaintiff was fully aware of the risk of serious injury that could be caused by a deploying airbag and in light of plaintiff's unambiguous admission no juror could find otherwise. Thus, there was no need for a warning under well-established Kentucky law.[8]

■ Furthermore, plaintiff failed to establish the essential element of causation in connection with the case. Even under plaintiff's most favorable view of the law,[9] there must be proof linking the failure to warn causally with the injury. The analogy which the court has offered repeatedly in remarks from the bench is that of safety glasses and gloves with chain saws. A chainsaw manufacturer may well choose to advise, by a conspicuous warning, that a person operating a chainsaw should, at minimum, wear safety eyeglasses and protective gloves. The point of the warning, of course, is to advise the user to take a precaution which may reduce or eliminate the risk of certain kinds of injury. If the user wears safety eyeglasses, wood chips may not be propelled into the eye. Heavy gloves may prevent cutting or abrasion. The point of the warning is to change consumer behavior.

In argument on the Rule 50 motion, plaintiff's counsel was questioned by the court as to what different behavior the plaintiff would have engaged in had she been warned. Counsel identified three different behavior modifications: first, plaintiff would not have tried to blow the horn during the collision; second, plaintiff would have moved her seat farther back from the steering wheel; and third, plaintiff might not have bought a car with an airbag.

With respect to the first point, concerning blowing the horn, plaintiff failed completely to introduce any proof by expert or otherwise that, had plaintiff not been blowing the horn, she would not have suffered the injuries which she sustained in the accident. Plaintiff's trial testimony, while admittedly not based on a perfectly clear recollection of the sequence of events, was that when her car began to hydroplane and she began to cross over into the oncoming lane of traffic, she tried to steer with the left hand and she tried to blow the horn with the right hand. This was corroborated by the expert testimony of Dr. Smock, who analyzed the injury to her right hand, wrist, and forearm as consistent with blowing the horn when the airbag deployed. However, there was no testimony at all from Dr. Smock that, had her right hand been on the steering wheel rather than the horn, she would have suffered less or no injury. It is important to note that Dr. Smock, who carries a special interest in airbag injuries, opined clearly that, had the airbag not deployed, Ms. Demaree would have "walked away" from the accident. But Dr. Smock was not asked and never gave an opinion that, had Ms. Demaree not blown the horn, she would have sustained a lesser or no injury to her right hand and arm.

Moreover, the physical evidence is all to the contrary of any hornblowing causation. The more serious injury, in terms of followup surgery, and permanent disability, is to the left arm of Ms. Demaree, the arm which she and Dr. Smock both say was the steering arm, i.e., which held the steering wheel while the right hand tried to blow the horn. In other words, not only was there no testimony to the effect that blowing the horn created worse injuries, the undisputed lay and medical proof at trial was that the more serious injury was on the left side, the side which held onto the steering wheel. There was no proof at all from which a rational juror could conclude that by blowing the horn Ms. Demaree suffered greater injury than she would have ' had she tried to steer with both hands. The causal link is missing completely, and the proof did not meet the *Morales* causation requirement.

---

8. This infirmity alone would be fatal to the failure to warn theory. There are additional flaws, described below.

9. *Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531 (6th Cir.1995).

The second area of changed behavior argued by plaintiff's counsel was that, had there been an adequate warning, plaintiff would have moved her seat farther back. There was never any proof, expert or otherwise, that Ms. Demaree's injuries to hands, wrists, and arms would have been lesser had she moved her seat back. Indeed, this theory apparently was not even offered prior to the argument on the Rule 50 motion. She did not suffer an injury to her face, head, neck, or torso, all of which might be moved back if she pushed her seat back somewhat. Instead, the injuries were to parts of her body which would be proximate to the steering wheel regardless of seat position. Dr. Smock, plaintiff's airbag injury expert, offered no testimony of any kind that a farther back seat position would have made any difference at all.

The contention that plaintiff would have used other means of transportation in the event of a warning is speculative and is belied by plaintiff's own actions: after the accident, she bought a car with an airbag. There is no proof that she would have used public transportation or some means of transit which would have allowed her to avoid airbags altogether.

Finally, the magistrate judge notes grave reservations about plaintiff's vague theory of warning. Plaintiff was very careful never to say what the warning should have been. The desired warning could, arguably, have been either a general or a specific one. A general warning might have warned consumers that the sudden deployment of airbags could result in serious injury or death. A specific warning might have been that one should not blow the horn during a frontal collision. Plaintiff artfully declined to specify whether the warning should be a "generic" air-bags-have-risks warning, or a "horn-specific" warning. Apparently this matter was to be left to the speculation of the jury.

The generic warning, that airbags have risks, would suffer the same flaw identified above: one of causation. What changed behavior would such a warning lead to for the plaintiff? No proof supported any reasonable inference that a warning generally that airbags have risks would have caused plaintiff to do anything which would have lessened or eliminated her injury. And plaintiff admitted knowing of risks to her hands. Alternatively, a horn-specific warning would create other problems. Like a generic warning theory, it would suffer a causation flaw, for there was no proof that leaving the right hand on the steering wheel, rather than blowing the horn with it, would have lessened or eliminated the injury suffered by Ms. Demaree. And a specific warning that one should not blow one's horn in a collision raises a host of issues, never addressed by the plaintiff, about whether such a warning could be effective, whether it would discourage drivers from blowing horns (thus perhaps leading to a greater frequency of accidents which could be avoided by using the horn as a warning device), and whether a horn-specific warning could be offered up for consideration by the jury without expert testimony.[10]

### Conclusion

Airbags present important and interesting questions in products liability law. They are safety devices, mandated by federal law, which carry with them certain apparently unavoidable risks. They may save lives in certain instances but may cause injury in others. The essential issue in this case, as it ultimately was presented to the jury, was whether the airbag deployment threshold was set too low by Toyota. This may well be a question for fair debate among automotive safety experts, but on the record developed at trial there was no basis for a rational juror to conclude that there was a design defect in

---

**10.** Some courts have held that the need for a warning is a matter for expert testimony. *See, e.g., Wyeth Laboratories, Inc. v. Fortenberry,* 530 So.2d 688 (Miss.1988); *Hill v. Squibb & Sons,* 181 Mont. 199, 592 P.2d 1383 (Mont. 1979); *Dion v. Graduate Hospital of University of Pennsylvania,* 360 Pa.Super. 416, 520 A.2d 876 (Pa.Super.1987).

Toyota's airbag deployment decision, particularly after the elimination of Kita's fatally flawed analysis. The warnings issue fails for several reasons, including plaintiff's knowledge of the risk, as well as ones of causation. The knowledge of the risk, admitted by plaintiff, is by itself enough to defeat the warning's theory. There is no proof that had there been a warning and had Ms. Demaree had the presence of mind in as sudden emergency to heed it, that the warning would have eliminated or lessened her injury. Finally, the plaintiff never introduced any proof of what a warning might have been and whether it would have been specific to blowing of the horn or generally as to overall airbag risks.

Removing a case from a jury's consideration is not a decision which a trial judge can undertake lightly. However, under the clear dictates of *Daubert,* certain fundamental levels of reliability for expert opinion must be met. Here, the trial court was compelled to grant the motion to strike on the threshold deployment issue, and to grant the Rule 50 motion where there were numerous flaws in plaintiff's warnings theory. Airbags may or may not need further design refinement, but this case presented no facts and no expert proof from which a rational juror could conclude that Toyota had failed in its duty.