Lyzette **CRESPO, as Administratrix for the Estate of Michael Liz Castro, Deceased, and Lyzette Crespo, Individually, and Jose Liz, Plaintiffs,**

v.

**CHRYSLER CORPORATION, Defendant.**

**No. 97 Civ. 8246 JSR.**

United States District Court, S.D. New York.

Nov. 19, 1999.

Keith Silverstein, Silverstein & Huritz, P.C., Gary J. Douglas, Finz & Finz, New York City, for plaintiffs.

Jay P. Mayesh, Thomas Bloomer, Cooper, Liebowitz, Royster & Wright, Elmsford, NY, James P. Feeney, Peter Kellet, Patrick G. Seyferth, for defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

Automobile airbags are the proverbial mixed blessing. To inflate rapidly and forcefully enough to save lives they create a lethal hazard to young children and other small persons sitting too close to the point of deployment. Thus, according to the latest government data, while airbags

saved the lives of more than 4,700 people through October 1, 1999, in the same period they killed 146 people, of whom 84 were out-of-position children.[1] To be sure, those deaths could have been avoided if the victims had worn seat belts;[2] but part of the need for airbags derives from the unpalatable but undeniable fact that a significant number of people simply refuse to wear such belts.[3] Airbags respond to this improvidence, but not without creating risks of their own: risks that can be reduced but not eliminated.

The legal conundrums and moral dilemmas thereby posed are reflected in the instant case. During a vacation in August, 1995, Jose Liz rented a 1995 Dodge Caravan minivan manufactured by Chrysler Corporation and equipped both with seat belts and frontal airbags. On August 17, Liz was driving the minivan when it was involved in a relatively minor accident with another vehicle. As the parties stipulate, *see* Joint Pretrial Order at 1, the force of the impact was a Barrier Equivalent Velocity ("B.E.V.")[4] of 9 to 12 miles per hour ("mph"), a force sufficient in this case to deploy the airbags. The right front bag struck the head of Liz's five-year-old son, Michael, who was sitting, unbelted and unrestrained, in the front passenger seat. While the impact of the collision inflicted only minor injuries on the other occupants, the force of the deploying bag killed Michael.

In October, 1997, Mr. Liz and Michael's mother, Lyzette Crespo (individually and as administratrix for Michael's estate), filed the instant suit against Chrysler. Ul-timately, the suit was reduced to a claim by Ms. Crespo that the airbag was defectively designed.[5] On December 4, 1998, after a three-and-a-half week trial, a jury so found and awarded Ms. Crespo $750,-000.

Following entry of the judgment, defendant timely moved under Rule 50(b)(1)(C), Fed.R.Civ.P., to vacate the jury's verdict and enter judgment in defendant's favor as a matter of law, on the ground, *inter alia,* that plaintiff had failed to present sufficient evidence from which the jury could reasonably have determined that the airbag installed in the minivan was defectively designed.[6] Upon further review and reflection, the Court hereby grants the motion.

 The parties agree that New York substantive law governs this diversity action. *See Crespo v. Chrysler Corp.,* 1998 WL 542304, at *1 n. 1 (S.D.N.Y. Aug.25, 1998). Under that law, "[a] defectively designed product 'is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce.'" *Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520, 717 N.E.2d 679 (1999) (quoting *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983)). A manufacturer is held strictly liable for injuries proximately caused by the product's defect "because the manufacturer 'is in the superior posi-

---

1. *See* Keith Bradsher, "New Air–Bag Rules Would Again Require Vehicle Crash Tests," *N.Y.Times,* Nov., 3, 1999, at C.14.

2. *Id.* Moreover, in many states children of very young ages are forbidden to sit in the front seat without a specially designed seat. *See, e.g.,* New York Vehicle and Traffic Law § 1229–c(2) (McKinney 1999).

3. *See* Trial Transcript ("Tr.") at 613–615.

4. Barrier Equivalent Velocity, the standard measure of combined vehicle impact, is the impact equivalent to crashing into an infinite-ly rigid barrier at a given velocity. *See* Tr. at 1406. The purpose of B.E.V. is to combine into one speed-like measure the energies, forces, and motions that a vehicle experiences during a crash. *See, e.g.,* Tr. at 1059.

5. All claims by Liz, and all other claims by Crespo, were dismissed by the Court either at or prior to trial.

6. Defendant also moved in the alternative for a new trial or for remittitur.

tion to discover any design defects and alter the design before making the product available to the public.' " *Id.*

In other words, this is not the kind of strict liability that contemplates that the manufacturer will act as an all-purpose insurer of whatever risks accompany the use of its products. Rather, New York's approach "is rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

▉ Accordingly, a plaintiff seeking to recover from a manufacturer on a theory of defective design must, among other things, demonstrate not only that the product is dangerous but also that "it was feasible to design the product in a safer manner." *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204. New York law does not explicitly define "safer" in this context, but, consistent with New York's "risk/utility analysis," *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir.1997), it must mean, not simply that the manufacturer could have designed the product so that it would not have caused the victim's injuries, but also that doing so would not have rendered the product more-than-offsettingly unsafe for other relevant users. *See Restatement (Third) of Torts: Prod-*

*ucts Liability* § 2 cmt. f, at 23 (1998) ("It is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude.").[7]

This requirement that the alternative design be not only feasible but also safer for the relevant users is vital, for otherwise a plaintiff could recover simply by showing that a product could feasibly and without loss of utility be designed in such a way as to avoid injury to him alone even though the change would inflict injury on numerous others—an absurd position. Thus, the requirement that the plaintiff prove that it is "feasible to design the product in a safer manner," *Voss*, 59 N.Y.2d at 108, 463 N.Y.S.2d 398, 450 N.E.2d 204, must mean safer to the relevant set of users overall, not just to plaintiff.

▉ It is only after plaintiff has satisfied this burden of providing a safer, feasible alternative that the jury goes on to weigh whether, under all the relevant circumstances, the utility of the actual product outweighs the risk. *See Id.* at 108–09, 463 N.Y.S.2d 398, 450 N.E.2d 204.[8] Since, however, the sole utility of airbags is to promote safety, the latter question merges with the former, and under any analysis the question becomes: has the plaintiff shown that her alternative design is safer for automobile occupants than the defendant's design.

---

**7.** *Cf. Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1057 (11th Cir.1994) (applying Alabama law) ("The fact that an alternative design existed which would have reduced or eliminated Appellant's injuries does not mean that the alternative design was of greater overall safety."); *Hull v. Eaton Corp.*, 825 F.2d 448, 454 (D.C.Cir.1987) (applying Maryland law) ("[A] plaintiff must show that the magnitude of the danger from the product outweighed the costs of avoiding the danger—including, for example, any new dangers created and any reduction in the benefits of the product caused by the safer design."); *Miller v. Todd*, 551 N.E.2d 1139, 1143 (Ind.1990) (requiring a plaintiff "to demonstrate that a feasible, safer, more practicable product design would have afforded better protection"); *Owens v. Allis-*

*Chalmers Corp.*, 414 Mich. 413, 326 N.W.2d 372, 379 (1982) (under Michigan law, prima facie case of design defect requires, *inter alia*, evidence concerning impact of alternative forklift design on "operator's safety in other circumstances"). *See generally* James A. Henderson, Jr. & Aaron D. Twerski, "Arriving at Reasonable Alternative Design: The Reporters' Travelogue," 30 *U.Mich.J.L. Ref.* 563 (1997).

**8.** For example, an automobile designed to travel at speeds no greater than 20 mph might be safer for all occupants but would have limited utility. *See Restatement (Third) of Torts: Products Liability* § 2 cmt. a, at 16 (1998).

Here, both sides acknowledged at trial that the utility of airbags in saving lives decreases as B.E.V. decreases, whereas the risk of death to out-of-position passengers from deploying airbags—being largely a function of the size and position of the occupant and the speed at which the bag deploys—does not vary directly with B.E.V. Thus, at least theoretically, there is a B.E.V. below which a deploying airbag would kill more out-of-position occupants than it would save the lives of other occupants. The issue is further complicated, however, by the fact that, because the risk of death or injury created by a crash is not solely a function of B.E.V., airbags are designed to deploy within a "threshold range" that also takes account of other factors.[9]

In the instant case, it is undisputed that the airbag that killed Michael had a threshold range of 8 to 14 mph B.E.V. *See* Joint Pretrial Order at 1. This meant that, regardless of the other factors, the bag would never fire below 8 mph B.E.V. and would always fire at 14 mph B.E.V. or above; and that, within the range between 8 and 14 mph B.E.V., the airbag would deploy in some, but not all, instances, depending on the combination of factors.

Against this background, plaintiff argued to the jury that defendant's airbag was defective because there were no fewer than three safer, feasible alternatives to the threshold range selected by Chrysler. Specifically, plaintiff, based on the largely conclusory testimony of her expert witness Keith Friedman, argued that: (1) under no circumstances should the airbag have had a "no fire" point below 12 mph B.E.V., *see* Tr. at 1151–1159, 1172; (2) instead, the "ideal" threshold range for deployment of the airbag should have been 15 to 20 mph B.E.V., *see id.* at 1211–1212; and (3) another safer alternative to the Chrysler design would have been to remove the airbag from the vehicle altogether, *see id.* at 1210.[10]

■ Upon review, however, it is clear that plaintiff utterly failed to adduce any competent evidence that any of these proposed alternatives was safer than defendant's design.[11] Specifically, while plaintiff offered evidence that each of these alternatives would likely have prevented the death of Michael, plaintiff failed to provide any evidence from which the jury could reasonably have concluded that the number of lives saved (or injuries avoided) by adopting any of these alternative designs would be greater than the corresponding number of lives lost (or injuries sustained) as a result of such adoption.

Indeed, with respect to plaintiff's third proposed alternative—the elimination of airbags altogether (until two years later when they were federally mandated)—plaintiff failed to adduce even an iota of scientific evidence to contradict the testimony, and common sense conclusion, that airbags overall save many more lives than they cost, *see, e.g.,* Def.'s Exs. 1084 at ii–iv; 1085 at iii–iv; *see also* Tr. at 251, 276, 1452–1453. Accordingly, the jury could

---

**9.** Typical such variables might include the size and type of vehicle, impact speeds, and crash angles. *See generally* Michael Hoenig, " 'Gatekeeping' of Experts: Speculation and Dangerous Alternatives," *N.Y.L.J,* Sept. 13, 1999, at 3.

**10.** At the time of the manufacture of the vehicle here in question, federal regulations did not require the installation of airbags, as they subsequently did. Tr. at 190; Def.'s Ex. 1085 at iii. If, however, such bags were installed, they, and the warnings relating to them, had to comply with various requirements imposed by the National Highway Traffic Safety Administration. *See, e.g.,* Tr. at 206, 236.

**11.** The Court reaches this conclusion taking all of plaintiff's evidence received at trial most favorably to plaintiff. However, defendant has also raised a serious issue—not here reached by the Court—as to whether plaintiff's expert's testimony was so speculative and scientifically dubious on its face that it ought to have been stricken. *See Demaree v. Toyota Motor Corp.,* 37 F.Supp.2d 959, 962–67 (W.D.Ky.1999) (striking as speculative and unscientific the testimony of plaintiff's expert that a Toyota airbag was defectively designed and that a safer alternative was a threshold range of 20–25 mph B.E.V.).

not rationally have based its verdict on this alternative.

The same is true, though less obviously, with respect to the other two alternatives. If, to take the first alternative, the "no fire" point were raised from 8 to 12 mph B.E.V., the corresponding "must fire" point would increase from 14 to 18 mph B.E.V., since the evidence at trial was that the airbags for minivans that were technologically feasible at the time of the manufacture of the Chrysler minivan here in issue required a threshold width of 6 mph B.E.V.[12] In order to find the defendant's design defective under this scenario, the jury would therefore have to conclude that the reduced risk to occupants from raising the "no fire" point from 8 to 12 mph B.E.V. (both being speeds at which the crash itself rarely causes death) outweighed the increased risk created by raising the "must fire" point from 14 to 18 mph B.E.V. (*i.e.*, above the speed at which a meaningful number of crash-caused fatalities begin to occur, *see infra*). Similarly, even if plaintiff's second alternative of an "ideal" threshold range of 15 to 20 miles per hour B.E.V. were technologically feasible,[13] the plaintiff would have to show that the benefit of raising the "no fire" point from 8 mph B.E.V. to 15 mph B.E.V. would outweigh the increased risk from raising the "must fire" point from 14 mph B.E.V. to 20 mph B.E.V.

Notwithstanding the vague and conclusory statements from plaintiff's expert in support of his position, the only material evidence on this issue presented to the jury was a study entitled A.C. Malliaris, et al., *Harm Causation and Ranking in Car Crashes*, SAE Technical Paper Series (1985), which was introduced as Plaintiff's Exhibit 68A. The Malliaris study concludes that in the seven years for which data was examined, 1977–1983—*i.e.*, after the introduction of mandatory seatbelts but before the introduction of airbags—the risk of death in all reported automobile accidents with crash severities of 15 to 20 mph B.E.V. was 1.1% and the risk of serious injury was roughly 9%. *See* Malliaris Study, at 6–7, 9, Figs. 6 & 7; *see also* Tr. at 1324–1325. As summarized by defendant's expert (Tr. at 1429), and effectively conceded by plaintiff's expert (Tr. at 1325), the Malliaris Study shows that a statistically significant risk of fatality arises in crashes occurring at speeds as low as 15 mph B.E.V.[14]

On its face, the Malliaris Study thus indicates that a substantial number of fatalities will occur at speeds as low as 15–20 mph B.E.V. that would not occur if, as under Chrysler's design, an airbag always deploys within that range. However, the determination of how many of these fatalities would occur if, instead, the airbag only sometimes deployed within that range, as under plaintiff's proposed alternatives, and how that figure might compare with the concededly small number of fatalities to out-of-position occupants caused by air-

---

12. In her instant motion papers, plaintiff appears at one point to suggest that there is evidence in the record that a threshold width of only 5 mph B.E.V., rather than 6 mph B.E.V., was feasible at the time. Specifically, plaintiff asserts that defendant's expert Guy Nusholtz conceded that General Motors marketed a vehicle in Australia that contained a threshold range of 12.5 to 17.5 mph B.E.V. *See* Pl.'s Br. in Opp. to Def.'s Mot. for Judg. As a Matter of Law at 3. However, quite aside from the absence of evidence that this vehicle was of similar size and proportion to the Chrysler minivan, the transcript of Mr. Nusholtz's testimony shows that in fact he testified that the width of the threshold range on this General Motors airbag "would be about 6 miles per hour." Tr. at 1500–1501.

13. Again, there is no evidence in the record that a threshold range width of less than 6 mph B.E.V. was technologically feasible for a fully-functional minivan airbag installed at the time of the manufacture of the vehicle here involved, *i.e.*, 1995. *But cf. Demaree*, 37 F.Supp.2d at 962 (describing the threshold range in a different kind of vehicle, a Toyota Paseo, but of similar vintage, as "8–12 mph").

14. Indeed, studies show an incidence of fatalities at speeds as low as 10 mph B.E.V. *See* Tr. at 245–46, 319. While the reason that fatalities can occur at such relatively low speeds is unclear from the Study, it appears to be a function of the suddenness of the stop. *Cf.* Tr. at 981.

bags deploying at those speeds, was left entirely to speculation, so far as the jury was concerned, for plaintiff expressly chose not to introduce evidence of what either figure might be, even though such data were seemingly available.[15]

Instead, plaintiff elected to rely on other evidence that was either irrelevant to the issue at hand or that tended, at most, to qualify the Malliaris Study but still not carry plaintiff's burden. For example, plaintiff sought to rely on a study by the National Highway Traffic Safety Administration, introduced as Plaintiff's Exhibit 40, that concluded that unrestrained children suffer only minor injuries in automobile crashes of 12 miles per hour or less. On its face, however, this study is virtually irrelevant to determining whether or not a significant risk of fatality arises in crashes occurring at 12 to 18 mph B.E.V. (plaintiff's first alternative) or at 15 to 20 mph B.E.V. (plaintiff's second alternative).

Plaintiff also introduced, as Plaintiff's Exhibit 2A, a videotape of various crash tests run by Chrysler that, according to plaintiff, show that a crash at 18 mph B.E.V. poses no risk of serious injury to an unrestrained, out-of-position male of median size unless an airbag deploys. *See* Tr. at 1539–1551. Quite apart, however, from the fact that there is no evidence that a deploying airbag ever caused death to a midsized male (so that the comparison is irrelevant so far as fatalities are concerned), these few tests involving dummies of a particularly durable size and weight cannot reasonably be inferred to undercut the Malliaris Study's conclusion—based on full reported data from actual accidents—

that crashes of 15 mph B.E.V. to 20 mph B.E.V. present a 9% risk of serious injury to automobile occupants generally.

While plaintiff makes reference to several other items of evidence, *see* Pl.'s Supp. Post–Trial Br, at 3–4, the only other item even arguably relevant is the testimony of plaintiff's expert that by 1985 another manufacturer, General Motors, had created automobile interiors that "could protect occupants who were unrestrained in frontal impacts up to something in the range of 20 to 24 miles an hour." Tr. at 1162. Plaintiff now argues that the jury could have inferred from this statement that technology existed that would have allowed Chrysler to increase its threshold range to 18 mph B.E.V. without thereby putting a single additional passenger at risk. At trial, however, the jury was never asked to consider such a design as an alternative to the 1995 Dodge Caravan minivan, and was not presented any of the specifics of the design that would have permitted it reasonably to do so.

■ In sum, plaintiff never undertook to provide the jury with a reasonable means of estimating the number of persons beyond Michael whose lives would be saved (or injuries avoided) by the design alternatives plaintiff recommended, the number of persons whose lives would be lost (or injuries sustained) by any of plaintiff's proposed alternatives, or a reasonable basis for comparing the two. Without such evidence, the jury was without any reasonable basis on which to conclude that any of the plaintiff's proposed alternatives was safer than the allegedly defective airbag here at issue.[16]

---

**15.** Plaintiff appears, indeed, to have purposely chosen neither to obtain nor introduce such data, presumably because it would not have supported her position. Thus, for example, plaintiff's expert testified as follows:

DEFENSE COUNSEL: Is there any way to estimate, from the work done by Malliaris, an approximate number of people who died in automobile accidents at that crash severity, 15 to 20?
FRIEDMAN: There is a way.
THE COURT: What's the way?

FRIEDMAN: You would have to go through the data and compute the number of occurrences in that crash severity range, and then multiply it by the 1.1.
DEFENSE COUNSEL: Have you done that?
FRIEDMAN: No.
Tr. at 1324–1325.

**16.** Moreover, to the extent, if any, that defendant arguably had a burden to come forward with evidence of the comparatively greater safety of its design over the plaintiff's alternatives, the defendant more than satisfied this

■ Deprived of this crucial information, the jury was left to speculate about a necessary element of the case without having an adequate basis to do so. A verdict based on such speculation cannot stand. *See, e.g., Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir.1999); *Doctor's Associates, Inc. v. Weible*, 92 F.3d 108, 111–12 (2d Cir.1996).

Accordingly, the judgment previously entered following the jury's verdict is hereby vacated and the Clerk is directed to enter a new final judgment in favor of the defendant.[17]

SO ORDERED.

burden by its reliance on the Malliaris Study, which, although introduced by the plaintiff, fully supports the defendant's position and, indeed, was the only meaningful evidence bearing on the issue.

17. As a result of this disposition, defendant's alternative motions for a new trial or for remittitur are denied as moot.