Levi MOHNEY, et al., Plaintiff,

v.

USA HOCKEY, INC., etc.,
et al., Defendant.

No. 3:97 CV 7417.

United States District Court,
N.D. Ohio,
Western Division.

Jan. 23, 2004.

James R. Oates, Merrillville, IN, Fred C. Jug, Brandt, Milnes & Rea, Pittsburgh, PA, for Plaintiffs.

Rudolph A. Peckinpaugh, Jr., Eastman & Smith, Toledo, OH, Ann–Jeannine Foeller, Dickinson Wright, Detroit, MI, William A. Viscomi, Ernest W. Auciello, Jr., Timothy P. Whitford, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, Stephen D. Straus, Traub, Eglin, Lieberman &. Straus, Hawthorne, NY, Martin J. Witherell, Mary Ann Whipple, Ray A. Farris, Mark A. Shaw, Fuller & Henry, David W. Doerner, Doyle, Lewis & Warner, Wil-

liam H. Bracy, City of Toledo, Department of Law, John R. Kuhl, Bracy & Kuhl, Toledo, OH, for Defendants.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Plaintiffs Levi Mohney, Mary Mohney and Timothy Mohney's ("Mohney") motion for partial summary judgment (Doc. No. 227); Defendant Bauer Nike Hockey, Inc.'s ("Bauer") motion for summary judgment (Doc. Nos. 219 & 234); Plaintiffs' motion to exclude Defendant's expert testimony (Doc. No. 224); Defendant's motion to exclude Plaintiffs' expert testimony (Doc. No. 219 & 236); Defendant's motion to strike affidavits filed in support of Plaintiffs' opposition to Defendant's motions for summary judgment (Doc. No. 267); Plaintiffs' motion to determine the sufficiency of Defendants' Objections and Admissions (Doc. No. 275); Plaintiffs' motion to compel satisfaction of expert costs (Doc. No. 318); Plaintiffs' supplemental motion for the satisfaction of expert costs (Doc. No. 326); Plaintiffs' motion for order for oral argument for purposes of clarification of issue prior to mediation conference (Doc. No. 352); Plaintiffs' motion for oral argument (Doc. No. 357); and Plaintiffs' motion to compel/motion for sanctions (Doc. No. 265), which the Court previously took under advisement.

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1332. For the reasons stated below, Defendant's motion to strike affidavits filed in support of Plaintiffs' opposition to Defendants' motions for summary judgment will be granted in part and denied in part. Plaintiffs' motion to determine the sufficiency Defendant's Objections and Admissions will be granted in part and denied in part. Defendant's motion to exclude Plaintiffs' expert testimony will be granted in part and denied in part. Plaintiffs' motion to ex-clude Defendant's expert testimony will be denied as moot. Defendant's motion for summary judgment will be granted. Plaintiffs' motion for partial summary judgment will be denied. Plaintiffs' motion to compel satisfaction of expert costs will be granted in part and denied in part. Plaintiffs' supplemental motion for the satisfaction of expert costs will be denied. Plaintiffs' motion for order for oral argument for purposes of clarification of issue prior to mediation conference will be denied as moot. Plaintiffs' motion for oral argument will be denied. Plaintiffs' motion for sanctions will be denied as moot.

### BACKGROUND

The factual background of this matter is more fully set forth in *Mohney v. USA Hockey, Inc.*, 77 F.Supp.2d 859 (N.D.Ohio 1999). On May 21, 1995, Levi Mohney ("Levi") became a quadriplegic as a result of an incident that occurred while he participated in a scrimmage that was part of a developmental hockey camp. During the first scrimmage, one of the player's from Levi's team iced the puck by shooting it beyond the other teams red line. To avoid the imposition of an icing infraction against his team, Levi cut in front of Jason Reneger, a player from the other team. As the two players were quickly skating toward the boards, Renger fell into Levi from behind, and both players became entangled losing control and colliding with the boards causing Levi to sustain severe spinal damage at the C5–C6 level resulting in quadriplegia. At the time of the accident, Levi was wearing a helmet manufactured by Bauer and a face mask manufactured by Karhu. The mask was a cage type mask held in place by two j-clips. Plaintiffs assert that the mask released allowing Levi's head to torque into a crown position when the right-hand side j-clip dislodged when the two screw-nut combi-

nations affixing the j-clip to the helmet vibrated loose.

This Court granted summary judgment to Defendants on all of the Monheys' counts, including his products liability claims. Plaintiffs appealed the judgment of this Court. The Sixth Circuit Court of Appeals affirmed in part and reversed in part. *Mohney v. USA Hockey, Inc.*, 5 Fed.Appx. 450 (6th Cir.2001). The Sixth Circuit Court of Appeals affirmed this Court's grant of summary judgment in favor of Defendants Reneger, USA Hockey, Central States Hockey League and Toledo Cherokees and reversed with respect to then Defendants Bauer and Karhu, USA Inc. ("Karhu"), allowing Plaintiffs' products liability claims to proceed. The record in this case, includes volumes of deposition materials, multiple expert reports, an extensive (approximately thirty (30) hours) *Daubert* hearing and oral argument on *Daubert* motions, along with a Post-*Daubert* briefs and a number of other filings. Plaintiffs have now had an opportunity to develop and present evidence on their product liability claims.

Since the *Daubert* hearing, Plaintiffs and Karhu have negotiated a settlement, which has been filed under seal. (Doc. Nos. 347 & 348). The Court has delayed ruling on pending motions to afford Plaintiffs and Bauer an opportunity to resolve the within action by settlement. Those efforts appear to have been in vain and the Court will proceed to rule on all pending motions.[1]

## DISCUSSION

### 1. DEFENDANTS' MOTION TO EXCLUDE AFFIDAVITS

Pursuant to Fed.R.Civ P. 26 and 37, Bauer moves the Court to exclude the affidavits of Jamey Cearley, Terry Cearley and Dr. S. Ramnath (Doc. No. 261, Exs. F, G, and E), Dr. S. Ramnath, and Dr. Daniel A. Funk (Doc. No. 260.Ex.A) which Plaintiffs have filed in opposition to Defendants' motions for summary judgment, and to exclude the testimony of Plaintiffs' retained experts. Defendant asserts that the affidavits of Jamey and Terry Cearley should be excluded because Plaintiffs' have failed to timely identify them as witnesses and, due to the speed of the incident, it is physically impossible for them to have seen whether Levi struck the boards face first followed by a torque into the crown position.

For purposes of Plaintiffs' opposition to Defendants' motions for summary judgment and to exclude testimony by Plaintiffs' retained experts, the relevant inquiry is not whether Jamey and Terry Cearley were able to see the torque of Levi's head, but rather whether they observed a face first impact. No valid argument has been proffered that either was unable to see the initial point of contact. With respect to the lack of identification, Jamey and Terry Cearley's names have been known to all parties since at least 1997. Thus, Jamey and Terry Cearley's affidavits are admissible.

Defendant also seeks to exclude the affidavits of Dr. Funk and Dr. Ramnath, arguing that it is tantamount to offering expert testimony in contravention of disclosure requirements in Rule 26. Dr. Funk's affidavit presents findings regarding the helmet-mask combination in this case and their role in causing Levi's head to torque from a face first to a crown position. This affidavit represents an attempt to buttress the opinions offered by Mr. Johanson and Dr. Collins, Plaintiffs'

---

1. Since Bauer's motions reference and incorporate those of Karhu prior to its settlement with Plaintiffs, the Court includes them in its consideration and disposition of the motions ruled on herein.

retained liability experts, with testimony from an unlisted/unidentified expert witness. Thus, Dr. Funk's affidavit is inadmissible and stricken in its entirety.

■ Plaintiffs argue that as Levi's treating physician Dr. Ramnath is qualified to testify as to the cause of his injuries without disclosure/designation as an expert, and accompanying written report pursuant to Rule 26(a)(2)(B) directing the Court to *Martin v. CSX Transp., Inc.*, 215 F.R.D. 554 (S.D.Ind.2003). Initially, the Court observes that *Martin* does not endorse the position that a treating physician may testify without disclosure under Rule 26(a)(2)(A) & (B). There the plaintiff had disclosed his treating physicians as potential witness pursuant to Rule 26(a)(2)(A). *Id.* at 555.

The *Martin* court did find that the treating physicians testimony was admissible without a written report stating:

It is within the normal range of duties for a health care provider to develop opinions regarding causation and prognosis during the ordinary course of an examination. To assume otherwise is a limiting perspective, which narrows the role of the treating physician. Instead, to properly treat and diagnose a patient, the doctor needs to understand the cause of the patient's injuries. As such, a physician "whose proposed opinion testimony will come from his knowledge acquired as a treating physician, is *not* someone from which a Rule 26(a)(2)(B) report is required."

*Id.* at 577 (citations omitted).[2] In so doing, in *Martin*, the court also asserted that the "disclosure under Rule 26(a)(2)(A) provides sufficient opportunity" for the defendant to

discover and prepare for the treating physicians testimony. *Id.* at 557.

In *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255, 269 (6th Cir.2001), the court asserted that treating physicians were permitted to testify based on their general experience as to the "diagnostic cause and effect" of the plaintiff's carpel tunnel syndrome. *See also Prater v. Consol. Rail Corp.*, 272 F.Supp.2d 706, 712 (N.D.Ohio 2003).

Courts consistently have found that treating physicians are not expert witnesses merely by virtue of their expertise in the respective fields. Only if their testimony is based on outside knowledge, not on personal knowledge of the patient and his or her treatment, may they be deemed experts.

*Fisher v. Ford Motor Co.*, 178 F.R.D. 195, 197 (N.D.Ohio 1998) (citations omitted). "[T]he application of the Rule 26 disclosure requirements depends on the substance of the treating physician's testimony rather than his or her status." *Hawkins v. Graceland*, 210 F.R.D. 210, 211 (W.D.Tenn.2002). *See also Brown v. Best Foods*, 169 F.R.D. 385, 387 (N.D.Ala.1996); *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y.1995). In *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 501 (D.Md.1997) the court stated:

To the extent that the source of the facts which form the basis for a treating physician's opinions derive from information learned during the actual treatment of the patient—as opposed to being subsequently supplied by an attorney involved in litigating a case involving the condition or injury—then no

---

**2.** Indeed as Plaintiffs point out, the requirement of a formal written report:

[A]pplies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve

the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement of a written report.

Fed.R.Civ.P. 26 advisory committee's note (1993).

Rule 26(a)(2)(B) statement should be required.

By way of affidavit, Dr. Ramnath seeks to testify:

Levi Mohney was admitted to Flower Hospital on the morning of May 21, 1995. (Doc. No. 261, Ex. E, ¶ 1).

I completed the history and physical of Levi Mohney upon admission. A true and correct copy of the history and physical according to the Flower Hospital medical records is attached hereto as Appendix "A". *Id.* at ¶ 2.

Levi Mohney presented with the following history upon admission: "This seventeen year old young man was playing hockey at approximately 11:00 this morning and was thrown face forward into the boards, striking his face against the boards." *Id.* at ¶ 3.

Upon admission, I was called to the Emergency Room regarding a possible spinal cord injury and a fracture dislocation at C5–C6. *Id.* at ¶ 4.

X-rays of the cervical spine showed a fracture of the anterior portion of C5 and dislocation of C5 on C6 with the posterior margin of C5 about 8–9mm posterior to the posterior margin of C6. A CT scan of the cervical spine showed fractures of the body of C5, fractured lamina of C5 on the left, a vertical fracture through body of C6 and a fractured transverse formen at C7 on the left. *Id.* at ¶ 5.

Levi Mohney sustained an immediate and complete spinal cord injury and my impression is recorded in the Flower Hospital records as a fracture/dislocation C5–6 with C5–6 quadriplegia. *Id.* at ¶ 6.

The history that was obtained in the Flower Hospital Emergency Room was provided by the patient and his family within one (1) hour of the injury. *Id.* at ¶ 7.

This affidavit is made based upon my personal knowledge and findings of May 21, 1995, as recorded in the Flower hospital medical records. This affidavit is also based upon my review of the x-ray films that were obtained upon admission. *Id.* at ¶ 8.

I have had an opportunity to review the MiniDV tape of the accident. The accident is consistent with the history recorded in my records. Levi Mohney hit the boards face first. Subsequent to the initial impact, his head rotates down so that the crown of his head is in contact with the boards. *Id.* at ¶ 9.

This history is consistent with the facial impact and rotation into a crown presentation with a vertical load and hyperflexion type of injury. *Id.* at ¶ 10.

The injuries of Levi Mohney sustained are consistent with the history and physical findings of the injury recorded in the medical records of Flowers Hospital, and with the tape of the accident. *Id.* at ¶ 11.

It is clear that Paragraphs 1–8 contain information related to Dr. Ramnath's role as Levi's treating physician, and are admissible. The status of Paragraphs 9–11 are different.

The substance of these paragraphs is synonymous with the type of testimony offered by Dr. Richard Collins, Plaintiffs' causation expert, and is based on information learned outside the scope of Dr. Ramnath's role as Levi's treating physician. The Court acknowledges that Paragraph 10 does not mention the Mini–DV tape and Paragraph 11 references Levi's medical history along with the tape. The content of these paragraphs, however, is inherently linked to Dr. Ramnath's review of the Mini–DV described in Paragraph 9. Otherwise they would provide nothing more than that contained in Paragraphs 1–8, which describe Levi's medical condition,

and incorporate his medical records and history.[3] Dr. Ramnath's affidavit is admissible only to the extent that it buttresses and is derived from his role as Levi's treating physician. Therefore, Paragraphs 9, 10 and 11 are stricken.

Thus, Defendants' motion to strike the affidavits of Jamey and Terry Cearley, Dr. S. Ramnath and Dr. Daniel A. Funk is granted in part and denied in part.

### 2. PLAINTIFFS' MOTION TO DETERMINE SUFFICIENCY OF DEFENDANTS' OBJECTIONS AND ADMISSIONS

Fed.R.Civ.P. 36(a) sets forth in pertinent part:

If objection is made, the reasons therefor shall be stated. The answer shall specifically deny the matter or set in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made a reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny. A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone object to the request;

. . . . .

The party who has requested the admissions my move to determine the sufficiency of the answers or objections. Unless the court determines that an objection is justified, it shall order that an answer be served. If the court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served.[4]

Plaintiffs has moved to determine the sufficiency of Defendants Objections and Admissions with respect to Requests 2, 3, 4, 5, 6, 7, 8, 9 and 12 and request that the Court enter an order that each be deemed admitted. They assert that Defendant's responses fail to comply with Rule 36(a).[5]

**Request 2:** Any and all "warnings" that accompanied the Jofa mask have been produced in discovery in this case and are limited to the document that was identified as document 0005 at the deposition of the Jofa corporate designee. Also, any and all warnings that accompanied the helmet have been produced in discovery.

3. In Plaintiffs' reply to Defendant's response of October 3, 2003 (Doc. No. 364), they do not even argue that Paragraph 9 is premised on his role as one of Levi's treating physicians seeking to admit Paragraph 10, and those portions of Paragraph 11 that are "unrelated" to Dr. Ramnath's review of the tape.

4. Some of Plaintiffs' Requests for Admissions also seek production of documents. Rule 36(a) does not contemplate such production.

5. Initially, Plaintiffs also moved to have these requests deemed admitted with respect to Ka-

rhu for filing an untimely response. Karhu's response denied that it had filed an untimely response, and also contained a motion seeking leaving to answer requests for admissions out of time pursuant to Rule 36(a) (Doc. No. 298). During the *Daubert* hearing, however, Plaintiffs' counsel, Mr. Jug, represented to the Court that timing was not a true concern because Bauer responses, which are essentially mirror images of Karhu's, were timely filed.

**Request 3:** Absolutely no instructions and/or warnings were provided concerning the type of hardware and/or type of screws to be used to affix or join together the products that are the subject of this litigation.

**Request 4:** One of the two (2) brackets (also referred to in this case as L[sic] j-clips) that was used to mount the subject mask to the subject helmet failed at the time the product impacted the boards and Levi Mohney was injured.

**Request 5:** Levi Mohney's head was up at the time the subject product came into impact with the boards.

**Request 6:** At the time Levi Mohney was injured, the mask came into contact with the boards and the force of this impact caused one of the L[sic] j-clips/bracket to fail.

**Request 7:** Defendant, Jofa, and Defendant, Cooper [sic] Bauer, both were aware of the "Heads Up: Don't Duck Program" and the importance of the position of a hockey player's head as a way of preventing spinal cord injuries prior to Levi Mohney being injured. In addition to this Request for Admission, please consider this particular request as a request to produce all documents in their possession related to the "Heads Up: Don't Duck Program" and/or incidence of spinal cord injuries and/or relationships of such injuries to hockey helmets and/or mask in the possession of the Defendants on or before the date of Levi Mohney's injury.

**Request 8:** The helmet and mask that are the subject of this litigation were not compatible pursuant to the standards established by H.E.C.C. and/or ASTM. Please consider all copies of the compatibility lists in the possession of the Defendants.

**Request 9:** The products did not contain a warning that the Cooper helmet and Jofa mask were not to be used together and/or not compatible.

**Request 12:** The mask and helmet that are the subject of this litigation did not properly fit together.

Bauer denied Requests 4 and 6. Defendant answered that after reasonable inquiry, based on information known or readily available, that it was unable to admit or deny Request 5. Moreover, the testimony and other evidence demonstrates that these facts are in dispute and are central to the outcome of this matter. Thus, Requests 4, 5 and 6 are not deemed admitted.

Request 2 is vague and overly broad. Further, the discovery process, including depositions and the Court's orders to produce relevant documents, has satisfactorily addressed this issue. Therefore, Request 2 is not deemed admitted beyond that already stated. Bauer denied Request 3. and objected to this request on the basis that it lacks knowledge regarding "instructions and/or warnings" accompanying the mask or those provided by any other unidentified entities. Regarding Request 9, Bauer admits that it was not required to provide a warning regarding compatibility, and objected to the request with respect to the mask on the basis that it lacked knowledge regarding warnings provided with the mask. The qualified denials are proper under Fed.R.Civ.P. 36(a). Moreover, these requests are vague, especially in this case where a third-party affixed the mask to the helmet. Therefore, Requests 3 and 9 are not deemed admitted.

As to its own knowledge, Defendant objected to Request 7 on the basis that the request was vague and ambiguous. Bauer also objected to the request regarding Karhu's knowledge. The Court's review of deposition testimony by Bauer's corporate representatives demonstrates that Defendant was aware of the "Heads Up: Don't Duck" program and that the position of a

hockey player's head was important to preventing spinal cord injuries. (Doc. No. 264, Weber Dep. p. 106–07). Thus, Request 7 is deemed admitted.

Testimony by Defendant's expert witness, Mr. David Halstead ("Halstead") establishes that the mask and helmet were neither compatible nor did they conform to relevant ASTM standards. (Doc. No. 231, Halstead Dep., pp. 210–11). Therefore, Requests 8 and 12 are deemed admitted. Thus, Plaintiffs' motion to determine the sufficiency of Defendants' Objections and Admissions, and deem these requests admitted is granted in part and denied in part.

### 3. DAUBERT MOTIONS

#### A. DAUBERT STANDARD

The legal standard to be used in *Daubert* challenges was set forth by Judge Bechtle in his memorandum opinion issued on February 1, 2001:

Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786. The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than subjective belief or speculation. *Id.* at 589–590, 113 S.Ct. 2786. Further, Rule 702 requires that expert testimony assist the trier of fact, i.e., it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591–92, 113 S.Ct. 2786.

In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue. *Id.* at 592–93, 113 S.Ct. 2786. Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used. *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir. 1999).

In *Daubert,* the Court identified several factors to assist courts in evaluating whether a scientific theory or methodology constitutes reliable scientific knowledge. These include: whether the theory or technique can be or has been tested; whether the theory has been subjected to peer review and publication; whether a technique has a known or potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or method has general acceptance in the scientific community. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller,* 167 F.3d at 152.

In addition, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000). In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1179 (4th Cir.1997); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382b (5th Cir. 1996).

Moreover, testimony of an expert that constitutes mere personal belief as to

the weight of the evidence invades the province of the jury. *McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1988); *STX, Inc. v. Brine, Inc.,* 37 F.Supp.2d 740, 768 (D.Md.1999) (quotation omitted), *aff'd,* No. 99–1540, 2000 WL 564010 (Fed.Cir. May 8, 2000); *Sec. & Exch. Comm'n v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998).

Lastly, the court "should also be mindful of other applicable rules." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. Federal Rule of Evidence 703 "provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts and data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Id.* (quoting Fed.R.Evid. 703). Under Rule 703, "[i]f the underlying data are so lacking in probative force and reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded." *In re Paoli RR. Yard PCB Litig.,* 35 F.3d [717,] 748 (quoting *In re "Agent Orange" Prod. Liab. Litig.,* 611 F.Supp. 1223, 1245 (E.D.N.Y.1985)). *In re: "Diet Drugs" (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.,* No. MDL 1203, 2001 WL 454586, at *5–6 (E.D.Pa. Feb.1, 2001) (footnotes omitted). The district court is not required to hold a hearing to address a *Daubert* issue. *See Greenwell v. Boatwright,* 184 F.3d 492, 498 (6th Cir.1999).

### B. Defendant's Daubert Motions

The Mohneys' have retained the services of Mr. Norman Johanson and Dr. Richard Collins. Mr. Johanson has been retained to provide an opinion regarding alleged product defects associated with the helmet-mask combination Levi was wearing at the time of the incident. Dr. Collins opines on the mechanism by which Levi sustained his injuries due to the alleged defects. Bauer asserts that the opinions and testimony of both Mr. Jonhanson and Dr. Collins should be excluded for failing to satisfy any of the four factors for determining reliability set forth in *Daubert.* Defendant also argues that there is substantial evidence indicating that Dr. Collins abandoned his role as a scientist and become a paid advocate of Plaintiffs.

The Court has conducted an extensive inquiry into the qualifications of Mr. Johanson and Dr. Collins, and the reliability of their opinions. This inquiry has included a review of their deposition testimony, expert reports, testimony during a *Daubert* hearing (consisting approximately thirty (30) hours of testimony), along with summary of such evidence during oral arguments.

### 1. Mr. Johanson

#### a. Qualifications

Mr. Johanson holds a degree in mechanical engineering. He has significant experience in engineering that includes product design, review of safety issues, failure analysis, metallurgical evaluation functions and product testing. Thus, the Court finds that Mr. Johanson is qualified as an expert in mechanical engineering.

#### b. Reliability of Testimony

Mr. Johanson concludes that the incompatibility of the helmet and mask resulted in an asymmetric attachment of the mask.[6] This asymmetric fit was due to the interaction of the alignment of the two

---

**6.** Mr. Johanson measured the Shore A hardness of the helmet's liner and opines that it had experienced "a significant degradation of impact attenuation capability" due to a change from 25–45, further leading to Levi's injuries. (Doc. No. 224, Ex. G, p. 7, 10). In contrast to the incompatibility of the mask and helmet, the Court finds that Mr. Johanson's testimony on this alleged defect must be excluded. He acknowledges that he cannot

center vertical wires on the mask and the location of pre-drilled holes on the front of the helmet. Mr. Johanson maintains that this asymmetric fit resulted in the mask's full engagement with the left-hand side j-clip, but only minimal engagement with the right-hand side j-clip. The minimal engagement created pressure in a counter clock wise direction that he believes exacerbated a pre-existing loose fit of the two screw-nut combinations affixing this j-clip to the helmet. According to Mr. Johanson, Levi's face striking the boards provided the final force necessary for these screw-nut combinations to instantly and simultaneously vibrate apart at or near the initial time of impact. As a result, the j-clip dislodged allowing the mask to release leading to the downward torque that Dr. Collins opines led to Levi's spinal injuries.

Mr. Johanson testified that because the relevant defects were readily apparent, he did not need to perform any testing to form his opinions in this case (Doc. No. 249, Johanson Dep. Vol. II, p. 12). The Court notes, however, that since his deposition and in response to the opinions of Defendant's experts, Mr. Johanson performed what he alleges to be a test demonstrating that the screws and nuts holding the j-clip in place can vibrate loose.

### (1) Incompatibility of Mask and Helmet

Mr. Johanson's opines that the helmet-mask combination is incompatible as shown by the asymmetric fit as supported by his inspection and associated measurements. In his report, Mr. Johanson states: "Either the mask's wire spacing or the helmet's bolt hole spacing would have to be reduced to less than 1" or increased to more than 1.8" in order to have the Jofa mask attached symmetrically on the Cooper helmet. The Jofa mask can only be attached by shifting the mask to one side or the other." (Doc. No. 224, Ex. G, p. 6). Mr. Johanson found that either the mask's wire spacing or helmet's bolt space must be adjusted to have the requisite symmetric fit. The Court acknowledges that visual inspection is sufficient to demonstrate that the helmet and mask fit together asymmetrically. His measurements represent an objective assessment regarding the cause of this fit, which can be verified and critiqued. Mr. Johanson's testimony regarding the incompatibility of the helmet and mask has a reliable basis. It is also consistent with the Court's disposition of the Mohneys' motion to determine sufficiency of Defendants Objections and Answers. Thus, Bauer's motion to exclude

quantify when it moves from safe to unsafe in this regard. (Doc. No. 249, Johanson Dep., Vol. I, p. 189–90). Thus, Mr. Johanson's testimony regarding the change in Shore A hardness of the helmet lining is excluded.

He also asserts that the helmet's chin strap was defective. Mr. Johanson's report and his testimony provided during the *Daubert* hearing demonstrates that the chin strap is not central to Plaintiffs' theory of product defect, the asymmetric fit of the helmet and mask, and its role in causing Levi's injury. Though noting that the helmet's single strap system is insufficient and contributed to Levi's injuries (Doc. No. 224, Ex. G, p. 7), the findings section of Mr. Johanson's report does not identify the chin strap as a cause of Levi's injuries. (Doc. No. 224, Ex. G, pp. 9–10).

Mr. Johanson has also provided an opinion that the warnings on the mask and helmet were insufficient to warn Levi of the incompatibility of the two due to the asymmetric fit. The Court need not consider the admissibility of any testimony Mr. Johanson might offer as to the adequacy of any warnings/instructions provided, and thus will not address Defendant's motion for summary judgment on the failure to warn claim on this basis. As explained below, Bauer is entitled to summary judgment on Levi's failure to warn claim because Levi has directly and unequivocally testified that he never read any of the warnings on the helmet (or mask).

the testimony of Mr. Johanson on this issue is denied.

(2) Hardware Affixing Mask to Helmet

Mr. Johanson opines that the right-hand side j-clip immediately and simultaneously dislodged as the result of the already loose fitting screwnut combinations vibrating apart when Levi first collided with the boards.[7] In providing this conclusion he assumes that the remaining screw-nut combinations on the left-hand side j-clip are the same as those that were used on the right-hand side, which were never recovered. He concluded from observation that "minimal thread held the screw and nut in place." (Doc. No. 261, Ex. J, Johanson Aff., ¶ 5).

The Court finds that Mr. Johanson's opinion regarding the dislodging of the right-hand side j-clip is deficient. His opinion regarding the screw-nut combinations fastening the right-hand side j-clip to the helmet is based on visual inspection and observation. Mr. Johanson's testified at his deposition that he did not attempt to determine the thread class of the screws. (Doc. No. 249, Johanson Dep. Vol I., pp. 210–11). He also stated that he made no effort to test whether the thread class on the left-hand side was or was not sufficient even though such testing could have been done. Id. at 211. Mr. Johanson conceded to this lack of measurement and testing during the Daubert Hearing (Doc. No. 315, Daubert Hearing, Vol. III, pp. 593, 595). He asserted, however, that the correct interpretation of his deposition testimony was he had no reason to believe that "thread class" itself was or was not sufficient, but maintained that the "thread class" was unsuited for affixing j-clips. Id. at 595. While this may be true, his testimony establishes a lack of objective replicable testing or analysis, controlled by any standards, in support of his opinion that screw-nut combinations used to affix the j-clips to Levi's helmet were insufficient.

To buttress his opinion, and to refute the opinions of Defendant's experts, Mr. Johanson conducted a "test" by shaking the j-clip back and forth with his hand while resting an exemplar helmet on a table. (Doc. No. 315, Daubert hearing, Vol. III, pp. 598–600).[8] Mr. Johanson's shaking of a j-clip, however, is really no test at all. While he asserts that the force he exerted was less than that if combined with the asymmetry characterizing Levi's helmet and mask (Id. at 599), Mr. Johanson failed to explain or specify how the alleged test conditions otherwise replicated or even approximated those at the time of the incident. In short, Mr. Johanson's shaking of the j-clip is nothing more than an ad hoc demonstration without any controlling standards, rather than an objective scientific test that is replicable and verifiable. Moreover, his testimony and report also establish that he has cited no research or publications of any kind quantifying the impact forces necessary to vibrate loose the screw-nut combinations used to fasten the j-clips to Levi's helmet. Though Mr. Johanson may be correct in his opinion, admissibility turns on whether his opinion is the end product of a reliable methodology, which it is not. As a consequence, his

---

7. During the Daubert hearing, Mr. Johanson testified that he could not specify the exact moment during the incident that the screwnut combinations instantaneously dislodged and the right-hand side j-clip released. (Doc. No. 314, Daubert hearing, Vol. II., pp. 585–87). Bauer argues that this makes his opinion on this matter inadmissible. The Court disagrees. Mr. Johanson also testified that in all probability this instantaneous release occurred at the beginning of the 40 milliseconds Dr. Collins has estimated as comprising the entire incident. (Doc. No. 314, Daubert hearing, Vol. II, p. 622).

8. Mr. Johanson proffered a videotape of this exercise to the Court. (DH–25).

testimony regarding the failure of the right-hand side j-clip must be excluded.

### 2. Dr. Collins

#### a. Qualifications

Dr. Collins holds a Ph.D. in mechanical engineering. Dr. Collins has several scientific journal publications and reports to his credit. In addition to his position at Robson–Lapina, an expert consultative firm, when issuing his first report in this case, he has held positions as a professor of biological and medical engineering, physics, medicine, mathematics and biomedical and human factors engineering. Thus, the Court finds that Dr. Collins is qualified as an expert in the field of biomechanical engineering.

#### b. Reliability of Testimony

■ Dr. Collins has submitted a report along with two supplements containing his findings (Doc. No. 224, Ex. E). These reports along with his testimony during the *Daubert* hearing detail his theory and method of analysis demonstrating how the release of the mask resulted in the complete dissipation of the horizontal force acting on Levi's head. The complete and instantaneous dissipation of the horizontal force allowed the vertical force to dominate, resulting in a vertical torque that caused Levi's head to move from a face first position to a crown position causing a burst fracture of the C–5 to C–6 region resulting in quadriplegia (Doc. No. 246, Collins Dep., Vol. III, pp. 765–69). Critical to this conclusion is that the right-hand side j-clip dislodged either before or at time of initial impact, the underpinning for which he must rely on the opinion of Mr. Johanson.

As an initial matter, the Court must address Bauer's argument that several documents exchanged between Dr. Collins, Lance Robson and Tom Lacek during Dr. Collins employment at Robson–Lapina individually and collectively demonstrate that Dr. Collins has abandoned his role as an expert scientist blindly adopting Levi's testimony, and, following instructions from his attorneys, fabricated an opinion to conform to Plaintiffs' pre-existing theory of liability. These documents include several e-mails and preliminary reports downloaded from the Robson–Lapina computers, some of which indicate that Dr. Collins believed Levi sustained his injury from a crown first impact. (DH–6).

The Court is persuaded by Plaintiffs' arguments that Dr. Collins neither collaborated with the Plaintiffs' attorneys nor abandoned his role as an expert. Before the *Daubert* hearing, Mr. Robson, the President and a principle of Robson–Lapina, provided an affidavit clarifying that his criticisms of Dr. Collins were not directed at his failure to follow the scientific method or abandon his neutral role as a scientist. (Doc No. 274, Ex. A). In his affidavit, Mr. Robson maintains Dr. Collins initial report, issued during his employment at Robson–Lapina, was based on appropriate application of engineering and scientific principle and method of analysis based on the facts and information in this case. *Id.* at ¶ 14. Mr. Robson provided similar testimony at the *Daubert* hearing. Tom Lacek, Dr. Collins' mentor at Robson–Lapina, provided an affidavit (Doc No. 274, Ex. B) and testimony at the *Daubert* hearing whose relevant sum and substance is the same.[9]

Moreover, the Court is convinced by Dr. Collins own testimony that these docu-

---

9. The Court notes that Plaintiffs have not listed Mr. Lacek as an expert witness. Paragraphs 8 and 10 of Mr. Lacek's affidavit provide testimony regarding the methodology Dr. Collins employed in completing his two supplemental reports in addition to his February 20, 2002 report. The supplemental reports were completed after Dr. Collins' termination from Robson–Lapina. Testimony from Mr. Lacek concerning the supplemental reports falls outside the scope of any internal peer review process to which Robson–Lapina sub-

ments represent the interactive process all scientific inquires undergo in the evolution of a working hypothesis designed to reconcile all of the facts and data in a given situation. He describes the documents as illustrating a progression toward the torquing theory described in increasing detail in all of his published reports in this case. Dr. Collins also testified at the *Daubert* hearing that communication with Plaintiffs' counsel represents nothing more than the communication between a professional and his client. He also testified that he would neither change a report at an attorney's request nor include anything that he could not properly defend and support. Dr. Collins *curriculum vitae* demonstrates that he is a well published and respected member of the academic community. He is a man who has held several professorships at reputable universities. The Court finds it hard to believe that he would be willing to tarnish his distinguished career over this case. Thus, the Court rejects Defendant's assertion that Dr. Collins' opinion should be rejected as a "concocted theory"developed at the behest of the Plaintiffs' attorneys.

Dr. Collins' first supplemental report, dated July 30, 2002, contains measurements he performed regarding the distance of the mask from the front of the helmet, and a *qualitative* explanation of how this contributed to the rotational forces he argues took place as Levi struck the boards. (Doc. No. 224, Ex. E, First Supplement, pp. 1–2). In presenting his findings he notes that the front of the mask, in violation of ASTM standards, ex-

tends more than .8 inches from the front of the helmet, having the affect of increasing downward torque on Levi's head such that it rotated from face first to a crown impact with the boards. *Id.* In his second supplemental report, dated October 16, 2002, Dr. Collins uses several pieces of information to develop an illustrative *quantitative* analysis. (Doc. No. 224, Ex. E, Second Supplement, pp. 2–7). He describes this *quantitative* assessment as being grounded in Newton's laws of physics.

The Court focuses its attention on the second supplemental report and Dr. Collins testimony. This report represents the culmination of his analysis and most rigorous support for his novel application of dynamics in analyzing the mechanism of Levi's injuries. Under cross-examination, Defendants listed seven (7) inputs, most of which are assumptions, upon which Dr. Collins analysis and use of Newton's laws depends. These inputs are: 1) Levi was traveling at a speed/velocity of 7.8 mph prior to colliding with the boards; 2) the initial orientation of Levi's head was 72 degrees from the horizontal (based on a published paper of Dr. Richard Bishop an expert Karhu and Bauer have retained in this case); 3) a 45 degree angle of Levi's head upon impact; 4) the impact was with the upper portion of the mask; 5) the boards were rigid relative to the mask; 6) the deformation and release of the mask upon impact was instantaneous (i.e. causing complete dissipation of the horizontal force); and 7) the release of the j-clip as described by Mr. Johanson. (Doc. No. 314, *Daubert* hearing, Vol II., pp. 339–42, 349–50).[10]

---

jects *its* employees' *reports, and represents expert testimony from an unlisted/unidentified expert witness. Likewise, Mr. Lacek's review of Defendants' expert reports in Paragraph 9 also provides expert testimony from an unlisted/unidentified expert witness and is stricken in its entirety. Therefore, Paragraphs 8 and 10 are stricken to the extent that*

they *address Dr. Collins' supplemental reports, and Paragraph 9 is stricken in its entirety.*

**10.** Dr. Collins analysis also assumes the mass of Levi's head neck complex was 7.22 kg and the moment of inertia was 0.126 kg-ms$^2$.

Dr. Collins report states, and his testimony confirms, that he estimated 7.8 mph based on a review of a CD–ROM version of the incident. This was not based on the imposition of a time clock on the frame sequence of the event. During the *Daubert* hearing, the Defendants proffered a CD–ROM version of the incident taken from the Mini–DV version with a time sequence burned onto the frames. Plaintiffs did not object after being assured of proper media transfer and representation that the frame rate was thirty (30) frames per second. Defendants also produced a copy of a blue print with the dimensions of the ice rink. (DH–9).

After reviewing the time sequence, together with the dimensions from the blue print, Dr. Collins conceded that the velocity of Levi's impact was probably double what he estimated and as a result the amount of time for the torque to occur was half of the 14.55 milliseconds he estimated. *Id.* at 377–78. Dr. Collins' testimony clarified that determining the frame rate would have been of assistance in conducting his method of analysis. *Id.* at 381–82. He also conceded that he did not have the dimensions of the ice rink when he made his estimate, even though it would have been easy to obtain the blue print Defendant produced.

Dr. Collins also can no longer rely on the abrupt release of the j-clip, which is not a mere input but a necessary prerequisite for his rendition of events. The Court has already ruled that Mr. Johanson's opinion on that issue is inadmissible, and even if Dr. Collins has adopted it as his own, he provides no basis for such an opinion. Moreover, in response to the Court's inquiry, Dr. Collins testified that even without the instantaneous release of the right-hand side j-clip, the shape of the face mask might induce the torque necessary to have caused Levi's injuries, after which the whole mask detaches. (Doc. No.

314, *Daubert* hearing, Vol. II, pp. 353–54) Dr. Collins, however, also testified that he has not pursued this "analysis in any detail." *Id.* at 353.

Plaintiffs argue that such infirmities go toward the weight of Dr. Collins' analysis rather than its admissibility directing the Court to *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003) and *Ford v. Nationwide Mut. Fire. Ins. Co.*, 62 Fed. Appx. 6 (1st Cir. Apr.8, 2003). In *Quiet Tech.*, the court stated that the plaintiff's argument, which was not directed at the validity of the methodology employed, "but rather that the specific numbers ... used were wrong," goes to the weight of the evidence, and are best exposed through cross-examination. *Id.* 1345 (citations omitted). Likewise, in *Ford*, the court affirmed the admission of the defendant's accident reconstructions where the plaintiffs challenged the foundation. *Ford*, 62 Fed.Appx. at 7–11. The Court, however, is persuaded that the aforementioned shortcomings in Dr. Collins analysis combined with an overwhelming reliance on assumed values impugns the reliability of his analysis, especially in light of the novelty of his theory.

In *Coffey v. Dowley Mfg., Inc.*, 187 F.Supp.2d 958 (M.D.Tenn.2002), *affd.*, No. 02–5454, 2003 WL 23156640, 2003 U.S.App. LEXIS 26610 (6th Cir. Dec. 18, 2003) the plaintiff was injured while using a Super Hub–Shark ("SHS"), an automotive tool. The plaintiffs hired a professor of mechanical engineering who opined that the SHS was defective in design because the bolts would fail due to tensile and bending loads when used to remove hubs and rotors. The expert visually inspected the SHS, and conducted a computerized finite element analysis "to determine the torque that would be required to fracture the stud bolts." *Coffey*, 187 F.Supp.2d at 962. He acknowledged having assumed "certain

variables in completing the finite element analysis." *Id.* at 964. The *Coffey* court found that several of these assumptions were incorrect and stated:

[I]f [the expert] assumed certain parameters for his computerized finite element analysis, and those parameters were later proven to be incorrect, then the conclusion reached by the computer model would also be incorrect. This would be true if any of the parameters assumed by [the expert] were incorrect.

*Id.* at 974.

In *Coffey,* the court also asserted:

Lastly, [the expert] relied on a finite element analysis that was the product of a number of "guesstimations" and speculations. *Like a house of cards, once those foundations are disproved, the whole analysis collapses. Here, [the expert's] use and reliance upon a faulty finite element analysis constituted a faulty method, based upon faulty principles.* (emphasis added).

*Id.* at 976.

In addition, in *Coffey,* relying on *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir. 2000), the court maintained that reliance upon a theoretical form of testing did not represent an appropriate means of validating the expert's opinion because actual physical testing could have been done. *Id.* at 977. The parallels between the deficiencies of the expert in *Coffey,* and Dr. Collins' analysis now before the Court, are unmistakable. Dr. Collins acknowledged that physical testing could have been conducted to evaluate and verify his opinions and conclusions. (Doc. 245, Collins dep., Vol II, p. 491).

Even assuming *arguendo* that physically replicating the conditions present when Levi collided into the boards may be difficult and/or cost prohibitive, there were other available options to test Dr. Collins novel theory. The substantial reliance on assumed values for the parameters in the mathematical equations that form the basis of this method of analysis mandates that the selection of these values be validated by at least minimal testing. Dr. Collins could have employed computer modeling. He also might have used sensitivity analysis by assuming not only different values for all the assumed values but also different speeds, which he himself described as a standard practice. (Doc. No. 314, *Daubert* hearing, Vol II, pp. 342, 389). By assessing results in this manner, potential error rates in analysis and computation might have been developed and the robustness of the base analysis determined. All of this is missing from Dr. Collins analysis.

Plaintiffs argue, and the Court recognizes, that the use of dynamics (i.e. analysis of forces to predict motion in objects) even without actual testing may be recognized as a valid form of analyzing product design and their motion. *See Clay v. Ford Motor Co.,* 215 F.3d 663 (6th Cir.2000). In *Clay,* the court affirmed admission of an expert's opinion premised on dynamics to reconstruct the sequence of events in an automobile accident. The expert had never worked in the automobile manufacturing industry, tested a model of the vehicle at issue, or published "an article on auto handling and stability, although he ha[d] made presentations on those topics." *Id.* at 668. The expert's investigation was limited to reviewing a police accident report, some depositions, statements, photos and visiting the scene the day before testifying. *Id.* The defendant challenged admissibility based on the experts's failure to test his theories that the subject vehicle over steers and jacks, not the propriety of using dynamics. The *Clay* court asserted that "[t]he district court in its discretion, could have decided that [the expert's] failure" went to the weight, not admissibility of his testimony. *Id.* at 668–69.

The Mohneys also assert that Dr. Collins testimony should not be excluded because of his years of experience as a published and well respect bio-mechanical engineer. *See Clark v. Chrysler Corp.*, 310 F.3d 461 (6th Cir.2002). In *Clark*, the court rejected the defendant's challenge to the admission of the plaintiff's experts due to a lack of testing relative to the accident at issue. The *Clark* court affirmed the admission of the B–Pillar expert's testimony as he had a thorough technical knowledge of door latch systems, conducted extensive testing on latch systems including bypass failure which the plaintiff alleged, developed a test for bypass failure adopted by the government, demonstrated familiarity with the type of latch at issue, examined the actual latch along with others of the same kind, and showed knowledge of the "state-of-the-art and state-of the industry in door latches" at the time the decedent's truck was made. *Id.* at 467–70. Similarly, the latch expert had an extensive background in automobile safety testing including crash tests involving door latches, examined the subject truck, accident scene, police report, photos and depositions, and testified as to the state-of-the-art and state-of-the-industry and general testing of B–Pillars at the time the truck was made. *Id.* at 470–72.

While Dr. Collins' may have applied Newton's Laws of Physics in conducting an analysis of forces, reviewed photos and depositions, measured and examined the head protection system Levi wore, the novelty of Dr. Collins along with the infirmities of this theoretical analysis makes the lack of testing glaring and egregious. Indeed, neither the Court nor any expert testifying in this case has been able to identify any tests or scholarly literature, using dynamics or otherwise, documenting the mechanism of injury Dr. Collins opines occurred to Levi. *See Demaree v. Toyota Motor Corp.*, 37 F.Supp.2d 959 (W.D.Ky. 1999).[11] Moreover, the record fails to establish that Dr. Collins' experience as it applies to this case approaches that found to be satisfactory in *Clark*.

In sum, Mr. Johanson's opinion that the helmet and mask at issue are incompatible is admissible, but his testimony regarding the failure of the j-clip and release of the mask when Levi struck the boards is not. Dr. Collins opinion regarding the mechanism of injury is excluded in its entirety. Thus, Bauer's motion to exclude the testimony of Mr. Johanson and Dr. Collins is granted in part and denied in part.

### C. Plaintiffs' Daubert Motion

Bauer has retained the services of four expert witnesses. These experts include Dr. Patrick J. Bishop, Dr. Joseph Torg, Dr. Lawrence Thibault, and Mr. David Halstead. The Court need not consider whether Defendant's expert witnesses satisfy the *Daubert* requirements. The opinions of Mr. Johanson and Dr. Collins do not satisfy the requirements set forth in *Daubert*, and his failure to warn claim fails without considering the admissibility of any expert testimony. Therefore, the Mohneys' motion to exclude Defendant's expert witnesses is denied as moot.

### 4. MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

As an initial matter, the Court sets forth the relative burdens of the parties once a

---

11. In *Demaree*, the court excluded an expert's testimony for several reasons including *inter alia* that no other engineer shared the expert's opinion, there was no literature supporting his opinion, and his failure to perform any form of "virtual" testing including computer modeling or finite element analysis or "perform any mathematical calculations." *Id.* at 963–64. While Dr. Collins has performed mathematical calculations, the Court has found these calculations and thus the method employed to be suspect and unreliable.

motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is enti-

tled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

### B. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Bauer moves for summary judgment on the Mohneys' products liability claims and presents several arguments in support thereof. The Court finds that the issues of whether Bauer is a manufacturer under Ohio law, the inadmissibility of Plaintiffs' expert opinions, and Levi's testimony that he failed to read any warnings are dispositive.[12]

#### 1. Bauer is Only a Component Manufacturer

■ Bauer asserts that under Ohio law, as a manufacturer of non-defective components, it is not liable for any alleged defects introduced due to its helmet's combination with Karhu's mask on the part of a third-party. O.R.C. § 2307.71(M) provides in pertinent part:

"Products liability claim" means a claim that is asserted in a civil action and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

(1) The design, formulation, production, construction, creation, assembly, rebuilding, testing or marketing of that product;

(2) Any warning or instruction, or lack of warning or instruction, associated with that product.

(3) Any failure of that product to conform to any relevant representation or warranty.

---

**12.** The Court need not address Defendant's arguments that they are entitled to summary judgment under the physical facts rule and/or implied assumption of risk.

Relatedly, O.R.C. § 2307.71(I) defines manufacturer as "a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product." [13] "Under this definition an entity is a manufacturer if it assembles components into a design which creates a product." *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 617 N.E.2d 1068, 1073 (1993). In *Leibreich*, the defendant asserted that it was not liable as a manufacturer since there was "no allegation that the refrigeration unit was defective or negligently installed." *Id.* at 1072. The plaintiff countered that the defendant played the most important role in creating "a new product, allegedly a defective product, through its design and assembly of components." *Id.* The Ohio Supreme Court reversed the trial court's grant of summary judgment to the defendant stating:

> Given A.J. Refrigeration's role in the design and assembly of the truck, appellants claim that A.J. Refrigeration is responsible for ensuring that the delivery truck was safe for its intended use. Appellants argue that A.J. Refrigeration should have recommended and included in the design a different braking system which would have held the truck stationary when it was left unattended with the engine running. The evidence on the issue of whether A.J. Refrigeration was a manufacturer for purposes of strict liability in torts supports competing inferences. Determining how much input and final control A.J. Refrigeration had over the design and assembly process is a question for the jury to determine.

*Id.* at 1073.

In contrast to Bauer, the defendant in *Leibreich* played a direct role in installing and integrating its refrigeration unit (i.e.component) into a larger system of non-defective components that allegedly resulted in a dangerous final product. *Id.* See also *Miles v. Kohli & Kaliher Assoc. Ltd.*, 917 F.2d 235, 245 (6th Cir.1990) (duty to warn arises where the components manufacturer also provided the specifications and instructions for assembling the finished product).

In *Jacobs v. E.I. Du Pont De Nemours & Co.*, 67 F.3d 1219, 1242 (6th Cir.1995) the court maintained that "where a component part is not dangerous until incorporated into a finished product, courts have held that the component part supplier cannot be held liable on a common law design or manufacturing defect theory, unless the supplier exercised some control over the final products design." Likewise, in *Schaffer v. A.O. Smith Harvestore Prods., Inc.*, 74 F.3d 722, 729 (6th Cir.1996), the court stated under Ohio law "[w]ithout any evidence of defect in the component parts themselves, summary judgment is appropriate as to [ ] defective products claims." See also *Cervelli v. Thompson/Center Arms*, 183 F.Supp.2d 1032, 1046 (S.D.Ohio 2002) (asserting that under Ohio law manufacturers of non-defective components have not duty to warn about the dangers that may result from its integration into a product where the component manufacturer did not participate in the design or assembly process); *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267, 272 (1977) (holding that the duty to warn "does not extend to the speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependent upon the nature of their integration into a unit designed and assembled by another").

---

13. In addition to a statutory cause of action based on strict liability, a plaintiff may assert a common law negligent design claim as well.

*Carrel v. Allied Prods. Corp.*, 78 Ohio St.3d 284, 677 N.E.2d 795, 798–800 (1997).

Here, Plaintiffs argue that Bauer is a manufacturer because a helmet is a final product placed into the stream of commerce. During depositions prior to the *Daubert* hearing both Dr. Collins and Mr. Johanson testified that the incompatible combination of the mask and helmet, which are components of head protection system created the product defect (Doc. No. 245, Collins Dep., Vol. II, p. 497; Doc. No. 249, Johanson Dep., Vol. II, pp. 50–51, 118). Moreover, Mr. Johanson describes the mask and helmet as components of a head protection system (Doc. No. 249, Johanson Dep., Vol. II, p. 98). He also stated that the mask does not have the same defective nature if used with an appropriate helmet. (Doc. No. 249, Johanson Dep., Vol. II, pp. 120–21). Mr. Johanson did not equivocate from this position at the *Daubert hearing.* Mr. Johanson testified:

Q. Mr. Johanson, do you have an opinion as it relates to warnings whether or not the manufacturer should have informed Levi that the Cooper helmet and the Jofa facemask shouldn't be used together?

A. I do.

Q. And what is that opinion, sir?

A. *The opinion is that both of the manufacturers of the component parts that make up a head protection system,* that being the manufacturer of the helmet and that manufacturer of the mask, . . .

(Doc. No. 314, *Daubert* hearing, Vol. II, p. 442) (emphasis added).

He also testified:

Q. To your knowledge did Dr. Collins then incorporate that finding and that opinion, your learned opinion, into his injury analysis?

A. I believe he did.

Q. Thank you. Please continue.

A. After reviewing the mask to helmet attachment characteristics, I then entered into my analysis. *The*

*preface to the analysis, I identify helmets and facemasks as two components of an ice hockey head protection system* . . .

(Doc. No. 315, *Daubert* hearing, Vol. III, p. 535) (emphasis added).

Mr. Johanson further stated:

Q. What steps did you take to determine how often an incompatible facemask can rotate and torque—I'm sorry, I used the word—torque into a crown-first presentation.

A. I don't believe that question is appropriate for the incompatibility defect we have here. *You have two major components of a head protection system* that are incompatible and hazardous to a user . . .

*Id.* at 643 (emphasis added).

Plaintiffs provide no evidence that Bauer combined the helmet and mask into a single unit. Timothy Mohney testified that when the helmet at issue was purchased it had not come with a mask already attached as he would have used a mask already at home. (Doc. No. 39, T. Mohney Dep., Vol. I, pp. 37–38). Levi also testified that when the helmet was purchased it did not come with the mask attached, nor could he remember whether the mask and helmet were even purchased at the same time. (Doc. No. 40, L. Mohney Dep., Vol. I, p. 145). Levi has since testified that the components came together as a helmet-mask combination. (Doc. No. 247, L Mohney Dep., Vol. II, p. 280). Nevertheless, it is undisputed that Bauer did not sell its products as a single unit, and that whether purchased separately or as a unit, a third-party combined the helmet and mask into the helmet-mask combination Levi wore at the time of the incident.

Jean Francois Laprier, a corporate designee of Bauer, testified that the helmet in this case was designed to be used with j-

clips and that the purpose of the j-clips was to hold the mask in place, comply with requisite impact tests and avoid collapsing inward (Doc. No. 263, Laprier Dep., pp. 36–37, 44–45). Granted, there appears to be some doubt as to who provided the j-clips and associated screw-nut combinations for affixed to Levi's helmet. Mr. Laprier asserts that the j-clip hardware, including the clip, are "sold with the face mask." *Id.* at 37. On the other hand, Plaintiffs contend that Halstead's testimony at the *Daubert* hearing establishes that the j-clips likely came from Bauer, or at least raises a factual issue. With respect to an exemplar, not Levi's helmet, Mr. Halstead testified.

Q. The white J-clips that you're referring to, who provided those J-clips? Did they come from the manufacturer of—Cooper, Bauer Nike?

A. My suspicion is—and it is a suspicion; I'm pretty certain—I'm more than pretty certain they didn't come from Jofa, because I don't believe they came with the face protector. They probably came from Bauer. That would be my best guess. I'm not certain of that.

Q. So it's your understanding that the J Clips would have come from Bauer Nike but not from Jofa; is that correct, sir?

A. Those particular J-clips could have come from Bauer Nike and probably did not come from Jofa; that's as good as I can get it for you, Mr. Jug.

(Doc. No. 315, *Daubert* hearing, Vol. III, p. 796).

The record establishes, however, that Bauer was not the entity responsible for providing *instructions* on the assembly of Levi's mask and helmet. In fact, Laprier

has testified that it was the responsibility of the mask manufacturer to specify whether j-clips are to be used with a particular mask or not. (Doc. No. 263, Laprier Dep., p. 42). Similarly, Larry Weber, another corporate designee of Bauer, testified that if sold separately, the mask manufacturer was to provide instructions on how to properly use j-clips. (Doc. No. 264, Weber Dep., p. 90). The mask was supposed to be accompanied by literature that included a section entitled "Mounting Instructions" specifying how the mask was to be affixed to a helmet. (Doc. No. 227, Ex. F).[14] Accordingly, Bauer is not a manufacturer for purposes of Levi's products liability claims and is entitled to summary judgment.[15]

2. Insufficient Evidence Due to Exclusion of the Plaintiffs' Experts

 Bauer also moves for summary judgment arguing that the exclusion of Mr. Johanson and Dr. Collins leaves Plaintiffs without any competent evidence of product defect and causation. "A plaintiff cannot recover on a product liability claim unless he establishes, by a preponderance of the evidence, that the product was defective in manufacture or construction, was defective in design or formulation, was defective due to inadequate warning or instruction, or because it did not conform to a representation made by its manufacturer." *United States Aviation Underwriters, Inc. v. B.F. Goodrich Co.*, 149 Ohio App.3d 569, 778 N.E.2d 122, 126 (2002). A plaintiff must also demonstrate that the alleged defect was the proximate cause of his injury. *United States Aviation*, 778 N.E.2d at 126–27. *See also Kelley v. Cairns & Bros., Inc.*, 89 Ohio App.3d 598, 626 N.E.2d 986, 993 (1993).

---

14. These instructions also indicate that the mask was accompanied by screws and clips for affixing the mask to the front of the helmet.

15. As discussed in greater detail below, Bauer is entitled to summary judgment on Levi's failure to warn claim, on the separate basis of lack of proximate cause.

■ The Court has excluded Mr. Johanson's opinion as to the failure of the right-hand side j-clip used to affix the facemask to Levi's helmet were insufficient resulting in its dislodgment of the right-hand side j-clip is deficient, on which Dr. Collins' opinion depends. In addition to the myriad of its own shortcomings, exclusion of evidence as to the j-clip's failure is fatal to Dr. Collins' opinion. While there may be other theories upon which the purported torque of Levi's head might have occurred, Plaintiff is left without any admissible evidence as to the alleged defect and proximate cause of what is plainly a very abrupt complex sequence of events. Thus, Bauer is entitled to summary judgment on all but Plaintiffs' failure to warn claims on this basis, which the Court addresses based on a lack of proximate cause particular to failure to warn claims.

### 3. Failure to Warn

Bauer asserts that it is also entitled to summary judgment on Levi's failure to warn claims because there is no competent evidence to establish that the "head protection unit" posed a risk of spinal injury, the risk of spinal injury in playing hockey is an open and obvious danger, there were adequate warnings, and Levi's failure to read the warnings that were provided establishes a lack of proximate cause between use of the helmet-mask combination and his injures.[16] O.R.C. § 2307.76 states in pertinent part:

(A) Subject to divisions (B) and (C) of this section, a product is defective due to inadequate warning or instruction if either of the following applies:

(1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of the manufacturer, both of the following applied:

(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

(b) The manufacture failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause the harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

(B) A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of a failure to warn or instruct about an open or obvious risk or a risk that is a matter of common knowledge.

■ "Under Ohio law, a plaintiff asserting a products liability 'claim [ ] based on failure to provide adequate warnings not only must convince the fact finder that the warning provided is unreasonable, hence inadequate, but he also must establish the existence of proximate cause between the [product] and the fact of the plaintiff's injury.'" *Hisrich v. Volvo Cars of N. Am., Inc.*, 226 F.3d 445, 450–51 (6th Cir.2000) (quoting *Seley v. G.D. Searle &*

---

**16.** Thomas Blaine Hoshizaki, a corporate designee of Karhu, has testified that it was common knowledge that players would combine masks and helmets from different manufacturers together. (Doc. No. 226, Hoshizaki Dep., p. 108). Mr. Laprier testified that such mixing and matching was a common occurrence. (Doc. No. 263, Laprier Dep., p. 126). Other evidence exists that Defendant knew that players mix and match helmets and face masks from different manufacturers that were not compatible. (Doc. No. 261, Ex. A & B; Doc. No. 232, Sabelli Dep., p. 35).

Co., 67 Ohio St.2d 192, 423 N.E.2d 831, 838 (1981)). That is to say that a plaintiff must establish a manufacturer's duty to warn, that such duty was breached and that such breach was the proximate cause of the plaintiff's injury. *Brown v. Mc-Donalds Corp.*, 101 Ohio App.3d 294, 655 N.E.2d 440, 443 (1995). The standard imposed is the same whether such a claim sounds in negligence or strict liability. *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177, 1181–83 (1990).[17]

"In analyzing the proximate cause issue as it relates to failure-to-warn cases, the Ohio Supreme Court 'divided proximate causation ... into two sub-issues: (1) whether lack of adequate warnings contributed to the plaintiff's [use of the product], and (2) whether [use of the product] constituted a proximate cause of the plaintiff's injury.'" *Hisrich*, 226 F.3d at 451 (quoting *Seley*, 423 N.E.2d at 838). Moreover, in *Seley*, the Ohio Supreme Court stated that:

> [there is] a presumption that an adequate warning, if given, will be read and heeded. In such a situation, the presumption established works to the benefit of · the manufacturer. However, where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was the proximate cause of the plaintiff's [use of the product]. This presumption, absent the production of rebutting evidence by the defendant, is

sufficient to satisfy the first branch of the plaintiff's proximate cause burden. *Seley*, 423 N.E.2d at 838 (citations omitted).

In *Seley*, the Ohio Supreme Court also made clear:

> [A] fact finder may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed. The adequacy of such warnings is measured not only by what is stated, but also by the manner in which it is stated. A reasonable warning not only conveys a fair indication of the nature of the dangers involved, but also warns with the degree of intensity demanded by the nature of the risk. A warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone or lacking in a sense of urgency.

*Id.* at 837 (citations omitted). *See also Hisrich*, 226 F.3d at 453.

■ Even assuming arguendo that the warnings in this case, including that on the back of the helmet, were inadequate, the presumption of proximate cause is rebutted, and a claim of a failure to warn fails where the evidence directly establishes that a plaintiff did not read the warnings. *Hisrich*, 226 F.3d at 451(citing *Phan v. Presrite Corp.*, 100 Ohio App.3d 195, 653 N.E.2d 708, 711 (1994)). Levi's deposition testimony provides direct evidence he did not read any of the warnings. (Doc. No. 40, L. Mohney Dep., Vol. I, pp. 60–61, 129).[18] In fact, Levi testified:

---

17. One important distinction, however, is that the defense of comparative negligence is available for a failure to warn claim premised on negligence. *Id.* at 1183.

18. The actual warning on the back of the helmet reads:

> Ice Hockey is a collision sport which is dangerous. This helmet affords no protection from neck or spinal injury. Severe

> head, brain, or spinal injuries including paralysis or death may occur despite using this helmet. Do not use this helmet if the shell is cracked, or if the interior padding is deteriorated. Read instructions carefully before wearing.

Warnings also appeared "on a hang tag attached to the helmet, and on the box containing the helmet." *Mohney*, 77 F.Supp.2d at 878.

Q. All right. We talked about this earlier, but I guess I'd like to read this into the record now. There is a warning that is affixed to the back of the helmet, is there not?

A. Now I know that, yeah.

Q. Okay. You told us that you never read that before; right?

A. Before I got hurt, no.

Q. But it's there on the helmet; true?

A. Yeah.

Q. And it was able for you to—strike that. *It was in plain view for you to read?*

A. *Yeah, it is.*

*Id.* at 88–89 (emphasis added).

Levi also testified that he would not have read "the instructions or the warnings for the face mask before" putting it onto the helmet. *Id.* at 146. In fact, he further testified:

Q. Do you have any independent recollection now of your having attached cages or face masks to helmets yourself?

A. Sometimes I did, yes.

Q. How did you know how to do that?

A. Just common sense.

Q. So you didn't look at or review any instructions before you did something like that?

A. No. I never read no instructions.

Q. You didn't think it was necessary to read any instructions before you did something like that?

A. They had a little diagram. That was it.

Q. You don't remember whether you read any kind of warnings or other information that might have come with any of the cages that you had acquired over the years to put on your helmets?

A. No.

Q. You don't remember?

A. (Witness indicates negatively.) I know I didn't read any of the warnings or any of that stuff.

Q. Why are you so sure of that?

A. Because it was—the warning was on the back of the helmet, and I did not have to look on the back of the helmet.

Q. How many times do you think you took that helmet off and put that helmet on during the time that you had it and before you got hurt.

A. Hundreds of times.

Q. So hundreds of times you took that helmet off and put that helmet on, and you never looked at the back of it or read what was on it?

A. No.

Q. You certainly had the opportunity to do so; right, though?

A. Yeah.

Q. Literally hundreds of times?

A. The opportunity was there, yes.

*Id.* at 164–65.

The testimony does more than suggest he did not read any of the warnings. It is unequivocally establishes that he did not.

██ Levi has now submitted an affidavit wherein he asserts that he simply does not recall whether he did or did not read the warnings. (Doc. No. 261, Ex. K, Levi Mohney Aff. ¶¶ 5, 7) and directs the Court to *McConnell v. Cosco, Inc.,* 238 F.Supp.2d 970 (S.D.Ohio 2003) and *Falkner v. Para–Chem,* No. 21288, 2003 WL 21396693, 2003 Ohio App. LEXIS 2819 (Ohio Ct.App. 9th Dist. June 18, 2003). The Court is mindful, however, that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir.1997). *See also Reid v.*

*Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986).

In *McConnell*, a child suffered severe brain damage when his neck caught on a highchair's tray due to his caregiver's failure to strap him into the chair. The infant and his mother filed suit against the highchair manufacturer and the store in which the highchair was purchased alleging several claims including failure to adequately warn. While it did not have an instruction manual, the highchair contained warnings on the back and under the tray not to leave children unattended, to strap them in and not to rely on the tray to keep children in place. The *McConnell* court denied the defendants' motion for summary judgment due in part to a factual issue regarding the adequacy of the warnings placement. *McConnell*, 238 F.Supp.2d at 977. In *McConnell*, the court stated:

> Furthermore, [the caregiver's] testimony supports [p]laintiffs' alternative position that even if the warnings were adequate in content, they were not adequately displayed on the highchair. If the display of the warnings was inadequate, then [d]efendants cannot claim that [the caregiver's] failure to read the warnings absolves them of liability. Rather, a warning that is inadequate because it is not properly displayed can be the proximate cause of harm even if the user did not read the warning. Were the law otherwise, manufacturers would be free from liability for providing any warning no matter how obscure, but would be encouraged to use obscure warnings so that consumers would still use their product despite its risks.

*Id.* at 979–80 (citations omitted).

Likewise, in *Falkner*, the court found a failure to read an " 'inconspicuous' 'Do Not Use Indoors, Because of Flammability' warning" regarding the use of carpet glue failed to rebut the presumption of proxi-

mate cause. *Falkner*, No. 21288, 2003 WL 21396693, **9–10, 2003 Ohio App. LEXIS 2819, at **26–27. Moreover, one of the defendant's own employee's conceded that the "warning was 'not necessarily' conspicuous, and could easily be missed." *Id.*, 2003 WL 21396693, *7, 2003 Ohio App. LEXIS 2819, at *19.

Any contention that the warning(s) were inconspicuous or obscure is belied by Levi's own testimony *supra*, that the warning was in plain view. Parenthetically, the label on which the warning is provided is white, and sits against the black helmet. The word "WARNING," which appears in all capital letters, appears in white type face against a black backdrop encompassed within the white label, and is prominently displayed separate and above the actual warning. The actual warning then appears in black lettering against white background. Levi's attempt to create a factual issue as to the adequacy of the placement and prominence of the helmet's warning by way of affidavit to obfuscate his earlier deposition testimony that he did not read the warning provided on the helmet is without merit. Thus, Bauer's motion for summary judgment on Levi's failure to warn claim is granted.

### 3. Mary and Timothy Monheys' Derivative Claims Are Barred

Bauer argues that they are entitled to summary judgment on the claims of Timothy and Mary Mohney, Levi's parents, for medical expenses and loss of services since they are derivative of the primary claims of Levi. Defendant is entitled to summary judgment on Levi's claims. If Bauer is not liable to Levi, then Timothy and Mary Mohney's claims cannot survive. *See Grindell v. Huber*, 28 Ohio St.2d 71, 275 N.E.2d 614, 616–17 (1971); *Looman v. Bell–Herron Middle Sch.*, 129 Ohio App.3d 39, 716 N.E.2d 1197, 1199 (1998). Thus,

Defendant is entitled to summary judgment on Timothy and Mary Mohneys' claims for medical expenses and loss of services.

### C. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

#### 1. Product Defects

Plaintiffs move for summary judgment on their products liability claims, arguing that there exists no genuine issue of material fact regarding whether the helmet-mask combination was defectively designed and that the Defendants failed to provide adequate warnings on their products. The Court has granted Defendant's motion for summary judgment on all of Levi's product liability claims, and his parents claims for medical expenses and loss of services. Thus, Plaintiffs' motion for partial summary judgment on their product liability claims is denied.

#### 2. Permanent Disability/Damages

Plaintiffs also move for summary judgment on the issue of permanent disability/damages, asserting that there is no genuine issue of material fact that Levi's is a complete quadriplegic and completely disabled from any gainful employment. Plaintiffs' claims have been disposed of based on Defendant's and motion for summary judgment. Accordingly, the Mohneys' motion for partial summary judgment on the issue of permanent disability/damages is denied.[19]

### 4. PLAINTIFFS' MOTION TO COMPEL SATISFACTION OF EXPERT COSTS AND SUPPLEMENTAL MOTION FOR THE SATISFACTION OF EXPERT COSTS

Plaintiffs move the Court to compel Defendant to satisfy expert fees and costs related to the production of documents from the Robson–Lapina computer system, the appearance and testimony of Mr. Johanson, Mr. Lacek and Mr. Robson at the *Daubert* hearing; and the fees and costs of Dr. Collins for his appearance and testimony at the *Daubert* hearing.[20] Plaintiffs have attached invoices thereto, which the Court has carefully reviewed. The production of materials from the Robson–Lapina computer system was in compliance with a duly served subpoena.

Plaintiffs seek a total of $35,404.19 on behalf of Robson–Lapina as relates to Mr. Johanson, Mr. Lacek and Mr. Robson wherein they seek $30,387.50 for 110.5 hours of their time at an hourly rate of $275.00, along with $2,674.99 in expenses; $1,900.00 for retrieving information from the Robson–Lapina computer system; and $441.70 for company expenses including $179.50 in Federal Express charges, $235.20 in photocopying and $27.00 in notary fees.

Plaintiffs' also seek $24,771.10 for Dr. Collins. This amount includes $9,467.70 in relation to *Daubert* hearing, post *Daubert* hearing review of one of defendant's expert witnesses and discussion in preparation for later oral argument before this Court, along with $15,303.40 (simply denoted as carried over from a pervious invoice

---

**19.** The Court also notes that in a Memorandum Opinion and Order (Doc. No. 239), dated December 3, 2002, subsequently clarified in a later Memorandum Opinion and Order (Doc. No. 258), dated December 18, 2002, the Court had bifurcated the trial as between liability and damages. The issue of damages would have been presented to the jury only if Plain-

tiffs had prevailed on the issue of liability at trial.

**20.** Plaintiffs raised the issue of the satisfaction of expert costs during the *Daubert* hearing. (Doc. No. 313, *Daubert* Hearing, Vol. I, pp. 253–54) on which the Court reserved ruling.

which on its face provides insufficient information for the Court to consider).

Rule 26(b)(4)(C) states:

Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery pay the expert a reasonable fee for time spent in responding to discovery under this subdivision; and (ii) with respect to discovery obtained under subdivision (b)(4)(B) of this rule the court shall require the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

Before proceeding further, in regard to the production of documents from the Robson–Lapina computer system, Bauer sent Robson–Lapina a letter dated December 19, 2002, stating:

You have stated that you will produce a "back up" tape that existed on or about September 4, 2002, when your firm changed its computer system. We would like to arrange this production to take place on or by December 29, 2002, as ordered by Judge Katz. We would like to send defendants' information technology consultant to participate in the process, in conjunction with Robson Lapina's consultant if you choose to have one present.

. . . . .

We submit that Robson Lapina cannot refuse to fully respond to the subpoena, as you have proposed you will. As I stated, defendants will bear the costs of this effort and conduct the search in a confidential manner without reviewing materials concerning other Robson Lapina business. Once again, the information technology consultants could jointly conduct the search, and download only materials concerning Mr. Johanson's and [Dr.] Collins' work in this case.

(Doc. No. 324, Ex. A).

On December 26, 2002, Mr. Robson responded by way of letter confirming defendants willingness to pay for such costs. (Doc. No. 324, Ex. B). While the December 19 letter cannot be construed as an offer to pay professional fees of Mr. Johanson, Mr. Lacek or Mr. Robson's for their attendance at the *Daubert* hearing, Bauer's represented that it would pay the cost of technology persons used to complete the document retrieval.

Bauer concedes that the information obtained as a result of the subpoena were the same as those requested during the course of discovery. While neither Mr. Robson nor Mr. Lacek have been so designated, Mr. Johanson has been designated as one of Plaintiffs' experts. Based on a detailed review of the attached invoices, the Court finds that Mr. Johanson spent 3.25 hours in activities related to reviewing the documents from the Robson–Lapina computer system that were ultimately produced in this very complex case. *See M.T. McBrian, Inc. v. Liebert Corp.*, 173 F.R.D. 491, 493 (N.D.Ill.1997) (explaining that compelling circumstances such as the complexity of a case that includes voluminous material can justify payment of an expert's preparation time under Rule 26(b)(4)(C)). Bauer made use of these materials not only at the *Daubert* hearing, but in filings before the hearing as part of replies in support of its *Daubert* and summary judgment motions. Accordingly, Bauer must compensate Robson–Lapina for Mr. Johanson's time in the amount of $893.75.

Plaintiffs, however, cannot rely on Rule 26(b)(4)(C) to compel satisfaction of the costs and fees for Mr. Johanson, Mr. Lacek, Mr. Robson or Dr. Collins testimony at the *Daubert* hearing. A *Daubert* hearing is an evidentiary hearing not en-

compassed within discovery proceedings. While Mr. Lacek and Mr. Robson are employed by Robson–Lapina, Plaintiffs' retained expert firm, these individuals are not Plaintiffs' experts in this case. Further, as Bauer is entitled to summary judgment on all claims, Plaintiffs cannot base any claim for recovery of costs and/or fees to the extent otherwise permitted as a prevailing party. As a consequence, Plaintiffs' motion to compel satisfaction of expert costs is granted to the extent that Bauer is ordered to pay Robson–Lapina a total of $2,793.75 including $ 1,900.00 for the cost of document retrieval, and $893.75 for Mr. Johanson's time in reviewing those documents. Plaintiffs' supplemental motion for the satisfaction of expert costs is denied in its entirety.

### CONCLUSION

The rulings contained in this Memorandum Opinion dispose of Plaintiffs case before this Court. As noted in an earlier Memorandum Opinion of this Court, this case presents a terrible injury to a young man, significantly and adversely impacting his quality of life. No one connected with this case has ever contested the tragic impact of the injuries cause by the unfortunate accident in which Levi was involved. That impact has been directly felt by Levi and his entire family. Harsh as the result of this Court's conclusions appear to be, courts must always be driven and controlled by the Rule of Law and not permit "hard facts to make bad law."

For the reasons stated above, Defendant's motion to strike affidavits filed in support of Plaintiffs' opposition to Defendant's motions for summary judgment (Doc. No. 267) is granted in part and denied in part. Plaintiffs' motion to determine the sufficiency Defendants' Objections and Admissions (Doc. No. 275) is granted in part and denied in part. Defendants' motion to exclude Plaintiffs' expert testimony (Doc. Nos. 219 & 236) is granted in part and denied in part. Plaintiffs' motion to exclude Defendants' expert testimony (Doc. No. 224) is denied as moot. Defendant's motion for summary judgment (Doc. Nos. 219 & 234) is granted. Plaintiffs' motion for partial summary judgment (Doc. No. 227) is denied. Plaintiffs' motion to compel satisfaction of expert costs (Doc. No. 318) is granted in part and denied in part. Plaintiffs' supplemental motion for the satisfaction of expert costs (Doc. No. 326) will be denied. Plaintiffs' motion for order for oral argument for purposes of clarification of issue prior to mediation conference (Doc. No. 352) is denied as moot. Plaintiffs' motion for oral argument (Doc. No. 357) is denied. Plaintiffs' motion for sanctions (Doc. No. 265) is denied as moot.

IT IS SO ORDERED.